PTO/SB/57 (09-07)
Approved for use through 08/31/2010. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO-1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:
**Mail Stop *Ex Parte* Reexam**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

**Attorney Docket No.:** UPLAY-101RX

**Date:** August 21, 2008

1. ☒ This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number ___5,507,485___
   issued ___April 16, 1996___. The request is made by:

   ☐ patent owner.          ☒ third party requester.

2. ☒ The name and address of the person requesting reexamination is:

   uPlay, LLC

   2185 Faraday Avenue, #130

   Carlsbad, CA 92008

3. ☐ a. A check in the amount of $_____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

   ☒ b. The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1)
      to Deposit Account No. ___50-1105___ (submit duplicative copy for fee processing); or

   ☐ c. Payment by credit card. Form PTO-2038 is attached.

4. ☒ Any refund should be made by ☐ check or ☒ credit to Deposit Account No. ___50-1105___.
   37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. ☒ A copy of the patent to be reexamined having a double column format on one side of a separate paper is
   enclosed. 37 CFR 1.510(b)(4)

6. ☐ CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
   ☐ Landscape Table on CD

7. ☐ Nucleotide and/or Amino Acid Sequence Submission
   *If applicable, items a. – c. are required.*

   a. ☐ Computer Readable Form (CRF)
   b. Specification Sequence Listing on:

      i. ☐ CD-ROM (2 copies) or CD-R (2 copies); **or**
      ii. ☐ paper

   c. ☐ Statements verifying identity of above copies

8. ☒ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. ☒ Reexamination of claim(s) ___1-54___ is requested.

10. ☒ A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on
    Form PTO/SB/08, PTO-1449, or equivalent.

11. ☐ An English language translation of all necessary and pertinent non-English language patents and/or printed
    publications is included.

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO
to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete,
including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments
on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent
and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS
ADDRESS. **SEND TO: Mail Stop *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/57 (09-07)
Approved for use through 08/31/2010. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. ☒ The attached detailed request includes at least the following items:

    a. A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)

    b. An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. ☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. ☒ a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
The name and address of the party served and the date of service are:

Abelman, Frayne & Schwab

150 East 42nd Street

New York, NY 10017-5612

Date of Service: _____ August 21, 2008 _____; or

    ☐ b. A duplicate copy is enclosed since service on patent owner was not possible.

15. Correspondence Address: Direct all communication about the reexamination to:

☒ The address associated with Customer Number: | 23410

**OR**

| Firm or Individual Name | |
|---|---|
| ☐ | |
| Address | |
| City | State | Zip |
| Country | | |
| Telephone | Email | |

16. ☒ The patent is currently the subject of the following concurrent proceeding(s):
    ☐ a.  Copending reissue Application No. _____.
    ☐ b.  Copending reexamination Control No. _____.
    ☐ c.  Copending Interference No. _____.
    ☒ d.  Copending litigation styled:

Roblor Marketing Group, Inc. v. GPS Industries, Inc. et al.

S.D. Florida Case No. 08-21496 MORENO/TORRES

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| | August 21, 2008 |
|---|---|
| Authorized Signature | Date |
| Neal M. Cohen | 41,683 |
| Typed/Printed Name | Registration No. |

☐ For Patent Owner Requester
☒ For Third Party Requester

PTO/SB/57 (09-07)
Approved for use through 08/31/2010. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO-1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:
**Mail Stop *Ex Parte* Reexam**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

**Attorney Docket No.:** UPLAY-101RX

**Date:** August 21, 2008

1. ☒ This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number 5,507,485
   issued April 16, 1996 . The request is made by:

   ☐ patent owner.        ☒ third party requester.

2. ☒ The name and address of the person requesting reexamination is:

   uPlay, LLC

   2185 Faraday Avenue, #130

   Carlsbad, CA 92008

3. ☐  a.  A check in the amount of $_____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

   ☒  b.  The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1)
           to Deposit Account No. 50-1105 (submit duplicative copy for fee processing); or

   ☐  c.  Payment by credit card. Form PTO-2038 is attached.

4. ☒  Any refund should be made by ☐ check or ☒ credit to Deposit Account No. 50-1105
        37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. ☒  A copy of the patent to be reexamined having a double column format on one side of a separate paper is
        enclosed. 37 CFR 1.510(b)(4)

6. ☐  CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
        ☐ Landscape Table on CD

7. ☐  Nucleotide and/or Amino Acid Sequence Submission
        *If applicable, items a. – c. are required.*

        a. ☐ Computer Readable Form (CRF)
        b. Specification Sequence Listing on:

           i. ☐ CD-ROM (2 copies) or CD-R (2 copies); or
           ii. ☐ paper

        c. ☐ Statements verifying identity of above copies

8. ☒  A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. ☒  Reexamination of claim(s) 1-54 is requested.

10. ☒  A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on
         Form PTO/SB/08, PTO-1449, or equivalent.

11. ☐  An English language translation of all necessary and pertinent non-English language patents and/or printed
         publications is included.

*(handwritten: THIS IS A DUPLICATE FOR FEE PROCESSING COPY)*

[Page 1 of 2]

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/57 (09-07)
Approved for use through 08/31/2010. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. ☒ The attached detailed request includes at least the following items:

    a. A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)
    b. An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. ☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. ☒ a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
    The name and address of the party served and the date of service are:

    Abelman, Frayne & Schwab

    150 East 42nd Street

    New York, NY 10017-5612

    Date of Service:   August 21, 2008     ; or

☐ b. A duplicate copy is enclosed since service on patent owner was not possible.

15. Correspondence Address: Direct all communication about the reexamination to:

☒ The address associated with Customer Number: | 23410

**OR**

☐ Firm or Individual Name

Address

| City | State | Zip |
|---|---|---|
| Country | | |
| Telephone | Email | |

16. ☒ The patent is currently the subject of the following concurrent proceeding(s):
    ☐ a. Copending reissue Application No. _____
    ☐ b. Copending reexamination Control No. _____
    ☐ c. Copending Interference No. _____
    ☒ d. Copending litigation styled:

    Roblor Marketing Group, Inc. v. GPS Industries, Inc. et al.

    S.D. Florida Case No. 08-21496 MORENO/TORRES

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| Authorized Signature | Date |
|---|---|
| Neal M. Cohen | August 21, 2008 |
| Typed/Printed Name | 41,683 |
| | Registration No. |

☐ For Patent Owner Requester
☒ For Third Party Requester

Re-Examination of U.S. Patent No. 5,507,485

UPLAY-101RX

Attachment to Form PTO/SB/57

# REQUEST FOR REEXAMINATION OF U.S. PATENT NO. 5,507,485

<u>Identification of Claims for Which Reexamination is Requested</u>

In accordance with 37 CFR § 1.510, reexamination of claims 1-54 of U.S. Patent No. 5,507,485 ("the '485 Patent") is requested, in view of the following references:

| | | |
|---|---|---|
| 1. | Jones et al., | U.S. Patent No. 4,136,394 |
| 2. | Bonito et al., | U.S. Patent No. 5,095,430 |
| 3. | Barber, | U.S. Patent No. 5,245,537 |
| 4. | Slye et al., | U.S. Patent No. 5,261,820 |
| 5. | Jenkins et. al | U.S. Patent No. 5,294,110 |
| 6. | Germain, | U.S. Patent No. 5,319,548 |
| 7. | Huston et al., | U.S. Patent No. 5,364,093 |
| 8. | Bianco et al., | U.S. Patent No. 5,438,518 |
| 9. | Kelson et al., | U.S. Patent No. 5,558,333 |

Each of the above references qualifies as prior art at least under 35 U.S.C. § 102(e), because each is a U.S. patent with a filing date before the priority date of the '485 Patent. In addition, at least Jones and Bonito qualify as prior art under 35 U.S.C. § 102(b) because each has an issue date more than one year before the priority date of the '485 Patent.

To the best of Requestor's knowledge, the '485 Patent is still enforceable.

Reexamination of the claims is requested in view of the combination of references as set forth in the following table:

| | |
|---|---|
| Claim 1 | a. Bianco in view of Barber; and<br>b. Barber in view of Bianco; and<br>c. Barber in view of Huston |
| Claim 2 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 3 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 4 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 5 | a. Bianco in view of Barber; and |

**CERTIFICATE OF MAILING 37 C.F.R. § 1.8**

I hereby certify, pursuant to 37 C.F.R. § 1.8, that this paper (along with any item(s) referred to as being attached or enclosed) is being deposited with the U.S. Postal Service as Express Mail Label EV878942953US addressed to Mail Stop Ex Parte Reexam, Commissioner of Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date indicated below:

Date of Transmission:    August 21, 2008 _____

Neal M. Cohen

Re-Examination of U.S. Patent No. 5,507,485                                UPLAY-101RX

|  | b. Barber in view of Huston |
|---|---|
| Claim 6 | a. Bianco in view of Barber and Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 7 | a. Bianco in view of Barber and Jones; and<br>b. Barber in view of Huston and Jones |
| Claim 8 | a. Bianco in view of Barber and Jenkins; and<br>b. Barber in view of Huston and Jenkins |
| Claim 9 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 10 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 11 | a. Bianco in view of Barber and Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 12 | a. Bianco in view of Barber and Germain; and<br>b. Barber in view of Huston and Germain |
| Claim 13 | a. Bianco in view of Barber; and<br>b. Bianco in view of Barber and Bonito; and<br>c. Barber in view of Huston and Bonito |
| Claim 14 | a. Bianco in view of Barber and Huston; and<br>b. Barber in view of Huston |
| Claim 15 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 16 | a. Bianco in view of Barber and Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 17 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 18 | a. Bianco (§ 103); and<br>b. Bianco in view of Barber; and<br>c. Barber in view of Huston |
| Claim 19 | a. Bianco (§ 103); and<br>b. Bianco in view of Barber; and<br>c. Barber in view of Huston |
| Claim 20 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 21 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 22 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 23 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 24 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 25 | a. Bianco in view Bonito; and<br>b. Barber in view Huston and Bonito |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| Claim 26 | a. Bianco in view Bonito; and<br>b. Barber in view of Huston and Bonito |
|---|---|
| Claim 27 | a. Barber in view of Huston and Bonito; and<br>b. Bianco in view of Bonito and Huston |
| Claim 28 | a. Barber in view Bonito |
| Claim 29 | a. Barber in view of Bonito |
| Claim 30 | a. Bianco in view of Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 31 | a. Bianco in view of Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 32 | a. Bianco in view of Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 33 | a. Bianco in view of Bonito; and<br>b. Barber in view Huston and Bonito |
| Claim 34 | a. Bianco in view of Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 35 | a. Bianco in view Bonito; and<br>b. Barber in view of Huston and Bonito |
| Claim 36 | a. Bianco in view Slye; and<br>b. Kelson in view of Slye |
| Claim 37 | a. Bianco in view of Barber; and<br>b. Barber in view of Huston |
| Claim 38 | a. Bianco; and<br>b. Bianco (§ 103); and<br>c. Bianco in view of Barber; and<br>d. Huston (§ 103); and<br>e. Barber in view of Huston |
| Claim 39 | a. Bianco; and<br>b. Bianco (§ 103); and<br>c. Bianco in view of Barber; and<br>d. Huston (§ 103); and<br>e. Barber in view of Huston |
| Claim 40 | a. Bianco in view of Huston; and<br>b. Bianco in view of Barber and Huston; and<br>c. Huston (§ 103); and<br>d. Barber in view of Huston |
| Claim 41 | a. Bianco; and<br>b. Bianco (§ 103); and<br>c. Bianco in view of Barber; and<br>d. Barber in view of Huston |
| Claim 42 | a. Bianco in view of Huston; and<br>b. Bianco in view of Barber and Huston; and<br>c. Barber in view of Huston |
| Claim 43 | a. Bianco; and |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

|  |  |
|---|---|
|  | b. Bianco (§ 103); and |
|  | c. Bianco in view of Barber; and |
|  | d. Huston (§ 103); and |
|  | e. Barber in view of Huston |
| Claim 44 | a. Bianco in view of Jones; and |
|  | b. Bianco in view of Barber and Jones; and |
|  | c. Huston in view of Jones; and |
|  | d. Barber in view of Huston and Jones |
| Claim 45 | a. Bianco in view of Jenkins; and |
|  | b. Bianco in view of Barber and Jenkins; and |
|  | c. Huston in view of Jenkins; and |
|  | d. Barber in view of Huston and Jenkins |
| Claim 46 | a. Bianco in view of Huston; and |
|  | b. Bianco in view of Barber and Huston; and |
|  | c. Barber in view of Huston |
| Claim 47 | a. Bianco in view of Huston and Jones; and |
|  | b. Bianco in view of Barber, Huston, and Jones |
|  | c. Barber in view of Huston and Jones |
| Claim 48 | a. Bianco in view of Huston and Jenkins; and |
|  | b. Bianco in view of Barber, Huston, and Jenkins; and |
|  | c. Barber in view of Huston, and Jenkins |
| Claim 49 | a. Bianco; and |
|  | b. Bianco in view of Kelson; and |
|  | c. Barber in view of Huston and Kelson |
| Claim 50 | a. Bianco; and |
|  | b. Bianco in view of Kelson; and |
|  | c. Barber in view of Huston and Kelson |
| Claim 51 | a. Bianco; and |
|  | b. Bianco in view of Kelson; and |
|  | c. Barber in view of Huston and Kelson |
| Claim 52 | a. Bianco; and |
|  | b. Bianco in view of Kelson; and |
|  | c. Barber in view of Huston and Kelson |
| Claim 53 | a. Bianco; and |
|  | b. barber in view of Huston |
| Claim 54 | a. Bianco in view of Barber; and |
|  | b. Barber in view of Huston |

## Statement Pointing Out Each Substantial New Question of Patentability

### *Barber, U.S. Patent No. 5,245,537*

*Barber* was of record in the file of the '485 Patent, but this old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination.  Accordingly, *Barber* raises a substantial new question of patentability.

Page 4

Re-Examination of U.S. Patent No. 5,507,485                                      UPLAY-101RX

Barber clearly discloses a plurality of scenes of a golf course as recited in Claims 1, 18, 19 and 54 of the '485 patent, including the three specific scenes recited in Claims 1 and 54.  See, e.g., *Barber* col. 6, lines 15-22, ["The golf course data bank is used to store the following information for each hole of the golf course: 1) hole outline, which is used for display on the portable device 10 and for determining fairway boundaries; 2) green outline, used for display on the portable device 10; 3) hazards outline, used for display on the portable device 10; and, 4) coordinates of each hole and hazard, with respect to the reference coordinate system 24."].  However, the Applicant misrepresented to the Examiner that *Barber* disclosed only <u>two</u> views of each hole (Exhibit 1 attached hereto, Amendment dated December 5, 1994 annotated with underlining by Requestor), when in fact *Barber* discloses at least <u>three</u> views, including the three specific views recited in **independent Claim 1** of the 485 Patent.   The "hazards outline" disclosed in *Barber* is the same as the "approach" view recited in Claim 1 of the '485 Patent.  For one, the '485 patent itself states "For example, when a golfer is approaching a green 19, the exact placement of the hazard (such as trap 20 or pond 21) is critically important."  See '485 patent, col. 6, lines 34-36.  Likewise, *Huston* considers a hazards view is the same as an approach view by stating "Third, most techniques do not give an indication of the distance to most, if not all, of the hazards.  For example, it is important to know the distance the ball needs to carry a trap or water hazard in front of the green."  See *Huston*, col. 1, lines 61-65.  Moreover, those of ordinary skill in the art would immediately recognize that *Barber's* description of a "hazards outline" refers to the approach to a green, as the hazards are always placed between the tee box area and the green area, i.e. the approach to the green.

Further, contrary to the representations of the Applicant during prosecution, and the apparent reading of the Examiner, Barber indeed discloses "automatically" determining the location of the device on the golf course, and "automatically" displaying one the three views of the hole as determined by the location of the device on the golf course, as recited in at least independent claims 1 and 18 of the '485 patent.  See, e.g., *Barber* col. 2, lines 51-67 ["...the portable device continuously computes the coordinates... At any time therefore, the device can compute the distance of the golfer from any significant point on the golf course..."].  But the Applicant incorrectly argued to the Examiner that *Barber* did not disclose automatic determination of location from hole to hole (Exhibit 1 attached hereto [Amendment dated December 5, 1994]; Exhibit 2 attached hereto [Amendment dated April 26, 1995].  The examiner erroneously accepted the Applicant's argument and withdrew this rejection based upon *Barber*.  (See Exhibit 3, Office Action dated June 7, 1995, in which the rejection of claims 1 and 18 over Barber was withdrawn.)  First, independent claims 1 and 18 do not require "automatically" determining the location of the device *from "hole to hole."*  Thus, *Barber* plainly discloses "automatically" determining location (even if it does require calibration at some point).  Second, even if these claims were to require automatic determination from hole to hole, the quoted sections of *Barber* above are not restricted to a hole by hole calibration, and the detailed description of the preferred embodiment having hole by hole calibration does not negate this teaching.  The quoted sections of *Barber* explicitly teach that the device can be used "at any time" to compute the distance to any point on the golf course.  It may be that the device is less accurate if not calibrated hole by hole, but that does not negate this explicit disclosure of "automatically" sensing location, as recited in claims 1 and 18 of the '485 patent.  See *Beckman*

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

*Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547 (Fed. Cir. 1989) (a reference is prior art "for all that it teaches").

*Barber* similarly discloses displaying a selected one of the three views of the hole as determined by the location of the device, as recited in **independent Claim 1**. See, e.g., *Barber* col. 7, line 52 - col. 8, line 5 ["Player then keys in the hole number, one, and gets a view of the entire hole on display device 20. ... the portable device 10 would be used next once the player had arrived to the position of his ball. At that point, portable device 10 is referenced and the display screen is chosen that is appropriate."].

Further, *Barber* discloses storing handicap data in a memory of the device as recited in **independent Claim 28** of the '485 Patent. See, e.g., *Barber* col. 5, lines 24-28 ["The user initiates the use of the device by observing the information provided on display 20 including the hole number, in this case number two; the distance from the middle of tee box 26 to the middle of the green, 185 yards; par and hole handicap."]. The Examiner did not apply this teaching of *Barber* in any rejections, and therefore, this also raises a substantial new question of patentability.

These teachings of *Barber* would have been considered important to a reasonable examiner in deciding whether Claims 1, 18, and 28 (and their dependent claims 2-17, 20-24, 29, and 37) were patentable, and the same question of patentability as to these claims was not previously decided by the Office. Therefore there is a substantial new question of patentability. (See MPEP § 2242). Further, although *Barber* was cited in the file of the '485 Patent, because *Barber* is being presented in a new light as compared with its use in the earlier concluded examination of the '485 Patent, in view of the material new arguments set forth above, there is a substantial new question of patentability (see MPEP § 2242).

### *Bianco, U.S. Patent No. 5,438,518*

*Bianco* was not of record in the file of the '485 Patent, and therefore, its definite importance in deciding the patentability of the claims of the '485 patent raises a substantial new question of patentability.

*Bianco* discloses a portable GPS golf computer used for distance tracking, and which displays a plurality of graphical representations of the golf course depending on the current location of the device as recited in **independent Claims 1, 18, 19, 38, and 54**, of the '485 Patent. See, e.g., *Bianco* col. 10, lines 28-31 ["Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play." See also, e.g., *Bianco* Claim 19 ["A portable distance tracking system according to claim 8 wherein said system includes means for dynamically updating said displayed portion of said particular hole in dependence on said field location of said mobile interface unit."] *Bianco* presents new questions of patentability, and is not cumulative of the prior art of record, because no single prior art reference of record discloses a portable golf GPS device which automatically determines location and also displays one of a plurality of scenes of the golf course depending on the GPS determined location. Thus, the same question of patentability as to the claims could **_not_** have been decided by the Office in the previous examination of the '485 patent.

Page 6

*Bianco* also teaches storing and displaying stroke / scoring data, as recited in **independent Claim 25 and Claim 16** of the '485 Patent. See, e.g., *Bianco* col. 9, line 66 - col. 10, line 3 ["The mobile unit 200 can also provide the golfer with a convenient system for keeping score. Following the completion of a hole, the golfer can actuate the "SCORE" command key followed by the score for that hole. The processor 104 updates the golfer's score and transmits the updated score to the display 202a."]. See also, e.g., *Bianco* Claim 26 ["...said display includes means for displaying at least one of said hole scores at any particular time..."].

*Bianco* also discloses inputting and updating performance data, and communicating same along with a GPS-determined position, as recited in **independent Claim 49** of the '485 Patent. See, e.g., *Bianco* Fig. 3 (displaying position), and *Bianco* col. 9, lines 34-42 ["The processor automatically stores the displayed club choice, distance, course and hole information, and golfer position information for the particular hole. The processor 104 also uses this information to automatically update the golfers distance selection for the particular club selected. If the golfer repeats this procedure for each shot taken on the hole, a complete record of play on that hole will be stored. To recall this information at a later time, the golfer actuates the "RECALL" command key, and then specifies the course and hole of interest. To review successive shots, beginning at a particular hole, the golfer actuates the "NEXT" command key. In this way golfers can review their play on troublesome holes, and learn to avoid repeatedly making the same mistakes, such as incorrect club selection for particular shots."].

*Bianco* also teaches using replay means to replay a round of golf, as recited in **independent Claim 36** of the '485 Patent. See, e.g., *Bianco* col. 9, lines 34-50 ["The processor automatically stores the displayed club choice, distance, course and hole information, and golfer position information for the particular hole. The processor 104 also uses this information to automatically update the golfers distance selection for the particular club selected. If the golfer repeats this procedure for each shot taken on the hole, a complete record of play on that hole will be stored. To recall this information at a later time, the golfer actuates the "RECALL" command key, and then specifies the course and hole of interest. To review successive shots, beginning at a particular hole, the golfer actuates the "NEXT" command key. In this way golfers can review their play on troublesome holes, and learn to avoid repeatedly making the same mistakes, such as incorrect club selection for particular shots."].

*Bianco* also discloses updating the course data with daily tee positions, as recited in **independent Claim 38** of the '485 Patent. See, e.g., *Bianco* col.1, lines 601-61 ["Consequently, course operators periodically relocate the tees and the flags."]; col.2, lines 41-43 ["A further object of the invention is to provide golfers with accurate distance information on a golf course, regardless of the movement of the tees and the flags."]; col.7, lines 35-42 ["... up to date topography changes in the course can be incorporated into the digitized memory map. This can be easily accomplished via a central base computer such as that shown in FIG. 11 at 1000, located in the club house. Accordingly, in one embodiment, the, invention provides a centralized computer 1000, typically at the club house, for storing day-to-day course data."]; Claim 31 ["... said central computer includes means for updating said digitized map information stored in said mobile interface unit memory to reflect current golf course conditions."]

*Bianco* also teaches presenting the processor means with information representative of the individual player's skill (see, e.g., *Bianco* col.4, lines 15-18 ["a golfer can enter the score on a

particular hole, the number of penalty shots taken, and the number of putts taken. The memory element can store this information for later recall by the golfer."]; processing the information presented to the processor to provide the player with assistance for completing a hole, and modifying the visual display to display information including assistance for completing play on the particular hole from the current location of the movable object (see, e.g., *Bianco* col. 9, lines 21-32 ["The processor can also automatically accesses the club distance information ... and display a club suggestion for each shot. ... The processor 104 displays the new club choice in the "CLUB CHOICE:" field in the display 202b"], all as recited in **independent Claim 53** of the '485 Patent. Advising the player of club selection as stated above is also a recited limitation in **Claim 46.**

*Bianco* also suggests displaying a video image (see, e.g., *Bianco* col.10, lines 64-66 ["However, according to other embodiments, a small graphical display portion, such as those employed on hand held video games can be incorporated"], as recited in **Claim 13** of the '485 Patent.

These teachings of *Bianco* would have been considered important to a reasonable examiner in deciding whether Claims 1, 18, 19, 25, 36, 38, 49, 53, and 54 (and their dependent claims 2-17, 20-24, 26-27, 30-35, 37-48, and 50-52) were patentable, and therefore *Bianco* raises a substantial new question of patentability. (See MPEP § 2242).

### *Jones, U.S. Patent No. 4,136,394*

*Jones* was not of record in the file of the '485 Patent, and teaches elements of the claims of the '485 patent not relied upon in any other reference by the Examiner in the previous examination, and an Examiner would find these teachings in *Jones* to be important in deciding the patentability of the claims of the '485 patent. Thus, *Jones* raises a substantial new question of patentability.

*Jones* discloses inputting wind conditions into a portable golf unit, as recited in **Claims 7, 44 and 47.** See, e.g., *Jones* Abstract ["The remote unit also receives input wind conditions and determines range and direction corrections to the actual distance based upon these wind conditions. From the wind corrected distance, the remote unit automatically selects the proper club for the next shot."]. See also, e.g., *Jones* col. 2, lines 41-43 ["The golf distance indicator system includes the capability to input wind direction and wind strength conditions in the remote unit..."].

These teachings of *Jones* would have been considered important to a reasonable examiner in deciding whether Claims 7, 44, and 47 (and dependent Claim 48) were patentable, and therefore there is a substantial new question of patentability. (See MPEP § 2242). Further, these teachings of *Jones* would have been considered important to a reasonable examiner in deciding whether **Claims 8, 45, and 48** were patentable, because these claims refer to inputting ambient temperature conditions into a portable golf unit, and it would have been obvious to a person of ordinary skill in the art at the time of the invention to do so in light of the *Jones* disclosure of inputting wind conditions. Therefore there is also a substantial new question of patentability based upon *Jones*. (See MPEP § 2242).

Page 8

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

### *Jenkins, U.S. Patent No. 5,294,110*

*Jenkins* was not of record in the file of the '485 Patent, and teaches elements of the claims of the '485 patent not relied upon in any other reference by the Examiner in the previous examination, and a reasonable examiner would find these teachings in *Jenkins* to be important in deciding the patentability of the claims of the '485 patent. Thus, *Jenkins* raises a substantial new question of patentability.

*Jenkins* discloses means for measuring and inputting temperature conditions, and using same to adjust for club selection, as recited in **Claims 8, 45 and 48**. See, e.g., *Jenkins* col. 1, lines 12-16 ["... it is necessary for the player to know the distance which the ball is to travel and the effects of existing conditions for which he or she must compensate to acquire the desired shot."]; *Jenkins* col. 3, lines 21-26 ["FIG. 8 shows a graph of typical trajectory of golf balls hit using the wood clubs shown, at standard temperature and pressure with no wind present. ¶ FIG. 9 shows the typical trajectory of golf balls hit using the "irons" as indicated at standard temperature and pressure with no wind."]; *Jenkins* col. 4, lines 35-40 ["FIG. 4 shows a schematic of the electronic circuitry within the device 10. As noted before, the ambient conditions sensor 25, ... input data to the 32 bit Central Processing Unit."]; *Jenkins* Claim 1 ["A portable golf shot analyzer and club selector, comprising: ¶ ... said first memory being preprogrammed with statistics concerning optimal distance travelled by a golf ball struck by various golf clubs as well as statistics concerning effects of (1) various ambient conditions, ..."]; and *Jenkins* Claim 2 ["The invention of claim 1, wherein said ambient conditions include temperature, barometric pressure and humidity."]

These teachings of *Jenkins* would have been considered important to a reasonable examiner in deciding whether Claims 8, 45, and 48 were patentable, and therefore there is a substantial new question of patentability. (See MPEP § 2242).

### *Bonito, U.S. Patent No. 5,095,430*

*Bonito* was of record in the file of the '485 Patent. *Bonito* was also relied upon in rejecting some claims of the '485 Patent. However, *Bonito* is being applied herein in a different way, and therefore *Bonito* raises a substantial new question of patentability.

Specifically, *Bonito* was not relied upon in rejection of any of the claims of the '485 Patent for its teaching of a means for displaying a video image, as recited in **Claim 13** of the '485 Patent. See, e.g., *Bonito* Fig. 4 (40) and Fig. 4 (36), and *Bonito* col. 6, lines 15-16 ["The VIDEO RAM memory 40 is connected to the computer bus 32 via a display interface (DISPL IF) 36."] Video RAM (with display interface) is the only means for displaying video disclosed in the '485 Patent. See '485 Patent, Fig. 5 (46) VIDEO RAM and Fig. 5 (45) VIDEO RAM INTERFACE.

These teachings of *Bonito* would have been considered important to a reasonable examiner in deciding whether Claim 13 was patentable, and since these teachings of *Bonito* were not relied upon in rejection of any of the claims of the '485 Patent, there is a substantial new question of patentability. (See MPEP § 2242).

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

### *Germain, U.S. Patent No. 5,319,548*

*Germain* was of record in the file of the '485 Patent. However, *Germain* was not relied upon in rejection of any of the claims of the '485 Patent, and thus, its importance in deciding the patentability of the claims of the '485 patent raises a substantial new question of patentability .

*Germain* discloses using advertisements with a portable golf computer, as recited in **Claim 12** of the '485 Patent. See., e.g., *Germain* col. 2, lines 54-65 ["A single pocket-sized golf play recording card is provided for each hole. Each of the golf play recording cards may have the following information printed thereon:... advertisements ...."]. See also, e.g., *Germain* col. 5, lines 52-55 ["Promotional advertising data storage area 40 stores information concerning advertising printed on the golf play recording cards and other material printed by the system."].

These teachings of *Germain* would have been considered important to a reasonable examiner in deciding whether Claim 12 was patentable, and since *Germain* was not relied upon in rejection of any of the claims of the '485 Patent, there is a substantial new question of patentability. (See MPEP § 2242).

### *Kelson et al.,  U.S. Patent No. 5,558,333*

*Kelson* was not of record in the file of the '485 Patent, and its teachings raise a substantial new question of patentability.

*Kelson* teaches using replay means to replay a round of golf, as recited in **independent Claim 36** of the '485 Patent. See, e.g., *Kelson* col. 12, lines 46-60 ["A complete playback or reproduction of a round of golf for any or all of the holes played and recorded with the universal golf hole (FIGS. 3A, 3B, and 3C) is available on demand by the player through selection of item 26 ("PLAYBACK") on the main menu (FIG. 2). Golf ball 14 locations (FIGS. 3A, 3B, and 3C) for each shot, including their associated shot-by-shot displays 17 (FIGS. 3A and 3B), are available for viewing on monitor 80. This capability offers a sequential, hole-by-hole replay of a complete round or an optional individual replay of any selected hole. A menu selection "Exit" allows the player to return to the main menu"].

*Kelson* also teaches communicating performance of the player using graphs and charts, which is the only "means for communicating player's performance" disclosed in the '485 Patent as recited in **independent Claim 49** of the '485 Patent. See, e.g., *Kelson* Figs. 3-6. See also, e.g., *Kelson* col. 3, lines 53-55 (referring to a prior art system at that time) ["This system uses a data gathering procedure requiring the use of specific, detailed Stroke Logging Charts and uses charts and graphs to display results of individual golf play."]. See also, e.g., *Kelson* Abstract "The design of the system ... calculates and displays: ... (d) statistical data, i.e., score, fairways hit (68), greens in regulation (69), a correctable swing analysis (71), and a complete short-game analysis (54) of putting (63, 64, 65, 66), sand saves (60, 61, 62), and chipping (55, 56, 57, 58, 59)". See also, e.g., *Kelson* col. 13 line 64 through col. 16, line 5 (describing RESULTS AND ANALYSIS REPORT).

These teachings of *Kelson* would have been considered important to a reasonable examiner in deciding whether Claims 36 and 49 (and dependent Claims 50-52) were patentable, and since *Kelson* was not relied upon in rejection of any of the claims of the '485 Patent, there is a substantial new question of patentability. (See MPEP § 2242).

Page 10

Re-Examination of U.S. Patent No. 5,507,485                                      UPLAY-101RX

### *Slye et al., U.S. Patent No. 5,261,820*

*Slye* was cited of record in the file of the '485 Patent. *Slye* was also relied upon in rejecting some claims of the '485 Patent. However, *Slye* is being applied herein in a different way, and therefore *Slye* raises a substantial new question of patentability.

Specifically, *Slye* was not relied upon in rejection of any of the claims of the '485 Patent for its teaching of a simulation game in which the outcome can be altered by replaying a portion of the game, as recited in **independent Claim 36** of the '485 Patent. See, e.g., *Slye* col. 6, lines 5-11 ["The above-described steps can be repeated on saved files. In other words, if a user replays a game session and enters that session and begins playing anew, the changes and new game play can also be saved. The user can then replay the new session and alter it. This can be repeated over and over until the user has created the "perfect" game session." See also, e.g., *Slye*, col.6, line 62 through col. 7, line 2 ["The invented playback method and device are applicable to the simulation and video game industries. Specifically, the invented playback method can be used in any simulation where a user wants to record a play session for subsequent viewing and altering. Expressed differently, the method simply plays back a recorded play and then allows a user to interact with that recorded play as it is played back to alter the play. It is applicable whenever those features are desired."]

These teachings of *Slye* would have been considered important to a reasonable examiner in deciding whether Claim 36 was patentable, and since these teachings of *Slye* were not relied upon in rejection of any of the claims of the '485 Patent, there is a substantial new question of patentability. (See MPEP § 2242).

### *The '485 Patent is Not Eligible for a Date of Invention Prior to Its Filing Date*

During the prosecution of the application which issued as the '485 Patent the Applicant ("Fisher") filed a Declaration under 37 C.F.R. § 1.131 (Exhibit 4 attached hereto) in an attempt to swear behind a reference being newly cited by Fisher, namely International Publication No. WO 93/12439 naming inventors Gunthorpe et al. (hereafter "Gunthorpe et al."). However, the declaration filed by Fisher is wholly insufficient to prove a date of conception for any of the claims of the '485 Patent because the declaration fails to establish possession of the "whole invention claimed or something falling within the claim (such as a species of a claimed genus), in the sense that the claims as a whole reads on it." MPEP § 715.02; *In re Tanczyn*, 437 F.3d 830 (CCPA 1965) (Where applicant claimed an alloy comprising both nitrogen and molybdenum, a Rule 131 affidavit showing applicant made an alloy comprising nitrogen but not molybdenum found to be insufficient to prove a date of invention antedating a prior art reference).

In order to swear behind a prior art reference, a declaration must establish invention of the subject matter of the claims prior to the effective date of the reference. 37 C.F.R. § 1.131; MPEP § 715.02. The showing of facts must be, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from prior to said date to the filing of the application. *Id.* Moreover, original exhibits of drawings or records, or photocopies, **must** accompany and form part of the declaration, or their absence must be satisfactorily explained. *Id.*

The Rule 131 declaration filed by Fisher clearly does not establish possession of the "whole invention", or "something falling within", any of the claims for which reexamination is

being requested. Not only are Mr. Fisher's sworn statements completely silent as to many of the elements of the claims (including elements upon which Fisher relied on to distinguish the prior art), but the declaration is also devoid of any original exhibits of drawings or records, or photocopies showing such elements.

Claims 1-24, 37, and 54 all require a device that displays one of a plurality of golf course scenes as determined by the current location of the device on the golf course. The declaration does not describe any plurality of golf course scenes, let alone the three specific scenes recited in claims 1-17 and 37. The declaration is similarly silent as to displaying any particular view or scene as determined by the current location of the device. Accordingly, the declaration is ineffective to show possession of the subject matter of claims 1-24, 37, and 54 prior to the filing date of the application.

Claims 25-35 all require an input means for inputting stroke and betting data, and a processor means for computing, based on the stroke and betting data, scores and betting totals. Although some of the exhibits to the Fisher declaration mention scorekeeping and betting games, there is no disclosure of a means for inputting such information, or the use of a processor means to compute scores and betting totals based upon such information. Thus, the Fisher declaration is ineffective to show an earlier date of conception for claims 25-35.

Claim 36 recites a golf replay apparatus which includes replay means for interactively reenacting a game of golf on an electronic display, and *means for using an alternate club for at least one stroke* and determining the potential effect of such change on a previously played actual performance on a golf course. The Fisher declaration describes no such means, and at most includes a cursory reference to "game recording and replay features." This evidence is clearly insufficient to show possession of the claimed invention as recited in Claim 36, and therefore, the declaration is ineffective to show prior possession of the subject matter of Claim 36.

Claims 38-48 all require display means for displaying information representative of the layout of a selected individual hole of a golf course. Again, the Fisher declaration is completely silent as to this element of the claims. While the declaration generally describes displaying graphical course display, it does not disclose displaying information representative of the layout of a *selected individual hole of a golf course.* Similarly, the declaration does not describe a memory means for storing data representative of a plurality of parameters for each hole on the golf course, including daily tee positions. Thus, the declaration is ineffective to show a prior date of invention for claims 38-48.

Claims 49-53 all require means for inputting and updating individual player's performance and means for communicating player's performance. The particular means for inputting, updating and communicating player's performance as defined in the specification are not described in the Fisher declaration. For example, the means for communicating player's performance is defined in the specification at col. 11, lines 25-64, and Fig. 22 (the means/function claim limitation would also include structural equivalents). The communication of the player's performance explicitly includes the display of bar charts, time-series charts, and variance analysis charts. Therefore, the declaration fails to support an earlier date of conception for claims 49-53.

    The Fisher declaration also fails to show possession of many additional elements of claims 1-54 (e.g. claim 14 requires a "means for displaying the calculated position of a golf ball"; claim 15 requires a removable memory card, claims 28-29 require input of handicap data, etc.), but the failure to show possession of the features described above suffices to show that the declaration is deficient on its face. Accordingly, the above description is not intended to be a complete listing of all of the deficiencies of the Fisher declaration with respect to each claim, but instead an exemplary description showing that the declaration is ineffective to show an earlier date of invention as to each and every claim of the Fisher patent.

    Therefore, the Fisher declaration is insufficient to establish a date of conception of the subject matter of any of the issued claims prior to the filing date of the '485 patent. As a result, the declaration is ineffective to swear behind any prior art reference having an effective date prior to the filing date of the '485 patent, including *Bianco* et al. and *Gunthorpe*, et al. (WIPO 93/12439).

### *All of the Prior Art Relied in this Request is <u>Analogous art</u>*

    The references relied upon in this Request, including *Jones, Bonito, Barber, Slye, Jenkins, Germain, Huston, Bianco* and *Kelson*, are analogous prior art to the claims of the '485 patent. It is well established that in order to rely on a reference in making a case for obviousness under 35 U.S.C. § 103, it must be analogous prior art. MPEP § 2141.01(a). Prior art is clearly analogous if it is related to the same field of endeavor as the claimed invention. Still, "[u]nder the correct analysis, any need or problem known in the field of endeavor at the time of the invention and addressed by the patent [or application at issue] can provide a reason for combining the elements in the manner claimed. " *KSR International Co. v. Teleflex Inc.*, (2007) 127 S.Ct. 1727, 1742. Thus a reference in a field different from that of applicant's endeavor may be reasonably pertinent if it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his or her invention as a whole. MPEP § 2141.01(a).

    The Federal Circuit has articulated two separate tests which are sufficient to qualify a reference as analogous art: "(1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). However, as discussed above, the Supreme Court has made it clear that this test does not define the entire scope of analogous prior art, rather a common sense approach as opposed to rigid preventative rules should be used. *KSR v. Teleflex*, (2007) 127 S.Ct. at 1742, ("Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes").

    All of the references, except for Slye, are clearly analogous prior art because they are related to the same field of endeavor as the claimed invention, i.e. electronic golf rangefinder, game tracking and analysis devices. Slye is analogous prior art because it is directly related to solving the same problem as the '485 patent, namely, replaying a recorded game and altering aspects of the recorded game to determine the potential effect on the game. Slye is directed to a simulation video game, and does not explicitly refer to the game of golf. However, both the Examiner and the Applicant in the '485 Patent considered video games to be pertinent to the

Page 13

subject matter of the '485 patent. For one, the Examiner cited Slye during the original prosecution history of the '485 patent, and the Applicant did not object to Slye being non-analogous. Moreover, the '485 patent directly refers to video games in its description of the replay feature: "Video games which use an auxiliary CD ROM player for this purpose--i.e., enhancing background graphics--are presently available from manufacturers such as Atari, Sega and Nintendo. In addition, personal computers equipped with CD ROM drives are well suited for use as a home-based replay unit. Accordingly, replay unit 260 may be implemented using a variety of widely available video game or personal computer devices" See '485 patent, col. 9, lines 24-31.

## Obviousness Standard

A claim is unpatentable if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103(a). In *KSR v. Teleflex*, (2007) 127 S.Ct. 1727 ("KSR"), the Supreme Court held that there are no rigid rules for determining obviousness, and expressly rejected the Federal Circuit's previous rigid application of the teaching-suggestion-motivation test for obviousness. The Supreme Court found that the Federal Circuit had erred in four ways: (1) "by holding that courts and patent examiners should look only to the problem the patentee was trying to solve " (*KSR v. Teleflex*, (2007) 127 S.Ct. at 1742); (2) by assuming "that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem" (*Id.*); (3) by concluding "that a patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try'" (*Id.*); and (4) by overemphasizing "the risk of courts and patent examiners falling prey to hindsight bias" and as a result applying "[r]igid preventative rules that deny factfinders recourse to common sense" (*Id.* ).

Thus, in making a determination of obviousness, the Supreme Court instructed that: (1) common sense should be used to decide whether references can be combined to render a claim obvious, even if there is no explicit teaching-suggestion-motivation to combine them; (2) a patent claim is obvious if the combination of known elements was "obvious to try"; and (3) a claim is likely obvious if the improvement or substitution of element(s) yields no more than predictable results. *KSR v. Teleflex*, (2007) 127 S.Ct. at 1742.

## 35 U.S.C. § 112

Many of the claims of the '485 Patent are invalid under 35 U.S.C. § 112 for lack of written description, indefiniteness, and or lack of enablement. Requestor understands these issues are not proper to be brought up in a reexamination. Therefore, the statements made by Requestor herein are based on Requestor's best current understanding of the claims of the '485 Patent.

Re-Examination of U.S. Patent No. 5,507,485                              UPLAY-101RX

<u>Detailed Explanation under 37 CFR § 1.510(b)</u>

**1.    CLAIM 1**

<u>Claim 1- *Bianco* in view of *Barber*</u>

Claim 1 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #1a below shows Bianco teaches all elements of Claim 1 except for the specific three views of "said data stored in said memory means," namely "(i) the entirety of said hole, (ii) the approach to a green associated with said hole, and (iii) the green including said hole."

Claim Chart #1a below shows Barber teaches those three specific views, namely: (i) "hole outline," (ii) "hazards outline" and (iii) "green outline." As set forth above in the discussion of *Barber* in the <u>Statement Pointing Out Each Substantial New Question of Patentability</u>, the "hazards outline" view in *Barber* is the same as the "approach" view in the '485 Patent.

It would have been obvious to combine use of the specific three views of the golf hole as taught in *Barber*, with the golf device of *Bianco*, because *Bianco* itself teaches changing the views to be more specific depending on the position of the golfer on a particular hole. See, e.g., *Bianco* col. 10, lines 28-31 ["Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play."] Further, Bianco even cites Barber in the "References Cited" on the front page of Bianco.

Additionally, even without the specific teaching in *Barber*, a person of ordinary skill in the art at the time of the invention would have found it obvious to modify *Bianco* to use the three specific views because doing so would have made better use of the screen area. Even the '485 Patent itself recognizes this motivation at col. 6, lines 41-45 ["Therefore, the maximum benefit of the display means 16 can be attained by only displaying at any given instant that which the golfer is immediately concerned with in order to direct the golfer directly to the hole."].

| Claim Chart #1a (Claim 1) | | |
|---|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer comprising: | Abstract - "The invention relates to a portable distance tracking system for use by a player on a playing field. ... According to a preferred embodiment, the playing field is a golf course ..." <br><br> Fig. 1 (100); Fig. 2 (200) <br><br> 2:58-3:9 - "More particularly, the invention provides a portable distance tracking system for determining the position of a player and for communicating that position, along with other relevant information to the player. [...] In one preferred embodiment, the playing field is a golf course ..." <br><br> Claims 1-32 - "portable distance tracking | Abstract - "A golf distance tracking, club selection, and player performance statistics device having a portable movement measurer, a microprocessor connected to the movement measurer, a memory connected to the microprocessor, and an input keypad and a display output also interconnected." <br><br> Fig. 4 <br><br> 2:17-28 - "Accordingly, the golf distance tracking, club selection, and |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| | system" | | player performance statistics device of the present invention possesses the desired requisites of measuring distance, recording player performance, suggesting proper club selection based on distance and past performance, and being relatively compact and capable of being carried on the fairway attached to the golfer's belt or golf bag.  The invention includes a portable movement measuring system connected to a microprocessor. The microprocessor is connected to a memory for the storage and retrieval of data. Further, an input keypad and an output display device are connected to the microprocessor." |
|---|---|---|---|
| display means for displaying scenes representative of the geographic layout of a golf course; | Fig. 1 (110); Fig. 2 (202); Fig. 3 (202)<br><br>6:19-24 - "... the unit 102 ... includes a processor 104, position interface electronics 106, a user input interface 108, a display 110, and memory 112."<br><br>6:64-68 - "FIG. 2, depicts a mobile interface unit 200 of the type shown in FIG. 1, but particularly adapted for operation on a golf course.  The unit 200 includes a display 202 and keyboard interface 204. The display 202 can display both graphics and alphanumeric characters."<br><br>8:28-39 - "The display 200 provides a graphical representation of the selected hole in field 202a. As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed. Additionally, the processor correlates the position information provided by the position interface electronics 106 with the map information provided by the memory 112 to determine the position of the mobile unit 200 on the golf course. The golfer's position is illustrated on the display 202a by the character at 1." | | Fig 1 (20); Fig 4, Fig. 6; Fig 7; Fig 1 (14)<br><br>7:52-54 - "Player then keys in the hole number, one, and gets a view of the entire hole on display device 20." |
| memory means for storing *[data]* representative of said scenes for each hole on the golf course; | Fig. 1 (112); Fig. 2 (112); Fig. 3<br><br>6:19-22 - "the unit 102 ... includes a ... memory 112."<br><br>6:34-36 - "The memory 112 can store, among other information, digitally encoded positional information, such as digitized maps, for one or more particular playing fields."<br><br>7:3-5 - "The unit 200 also includes ... a removable memory module 210." | | Fig. 1 (16)<br><br>2:27-50 - "The microprocessor is connected to a memory for the storage and retrieval of data. Further, an input keypad and an output display device are connected to the microprocessor. This portable device is used in conjunction with a base system data base located in the club house. The base system data base in the clubhouse is comprised of a microcomputer |

Page 16

Re-Examination of U.S. Patent No. 5,507,485                    UPLAY-101RX

| | | |
|---|---|---|
| | 7:13-27 - "In response, the processor 104 accesses the map for the selected course from the memory 112, and the display 200 shows the selected course code in the "COURSE:" field. According to alternative embodiments, the golfer can change the memory module 210 to provide the appropriate course map or can receive, through the interface 208, a signal from the club house that automatically sets the appropriate course selection code. ... In response to that determination, the processor 104 can then access the digitilized map information stored in memory 112 for the particular golf course."<br><br>7:32-34 - "in which case the course can program the appropriate course map into the memory 112 before time"<br><br>8:28-34 - "The display 200 provides a graphical representation of the selected hole in field 202a. As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed."<br><br>10:28-31 - "Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play." | suitable for running software that enables the long-term storage of all of the member player's performance data as well as room for the storage and processing of the topographical data of each golf hole required by the portable device to compute a player's distance from each hole and hazard. Further, the golf club base system provides the input/output capabilities needed to transfer data between the base system and the portable device. ¶ Once the topographical data and the individual player's data is downloaded to the portable tracking device, the golfer aligns the device with an orientation reference point on any suitable marked object. This establishes a reference coordinate system. For each golf hole, the portable device is provided with the cartesian coordinates, with respect to the reference coordinate system, of important points along the fairway, i.e. the hole, the hazards, etc."<br><br>3:48-51 - "Memory 16 is provided in the form of a random access memory capable of storing golf course geometrical and topographical data and player performance data." |
| said data stored in said memory means including data representative of three different views for each hole, including: (i) the entirety of said hole, (ii) the approach to a green associated with said hole, and (iii) the green including said hole; | Fig. 3<br><br>7:25-28 - "In response to that determination, the processor 104 can then access the digitilized map information stored in memory 112 for the particular golf course."<br><br>8:25-34 - "Additionally, in response to receiving the hole designation, the processor 104 accesses map information stored in memory 112 and transmits this information to the display 200. The display 200 provides a graphical representation of the selected hole in field 202a. As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed."<br><br>10:28-31 - "Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play." | Fig. 6; Fig. 7<br><br>5:47-52 - "Further, the base system 70 provides the needed storage and processing capabilities for creating and maintaining each golf hole's topographical data required by the portable device 10 of the invention to compute the player's distance from the hole 32 and any hazards."<br><br>6:15-22 - "The golf course data bank is used to store the following information for each hole of the golf course: 1) hole outline, which is used for display on the portable device 10 and for determining fairway boundaries; 2) green outline, used for display on the portable device 10; 3) hazards outline, used for display on the portable device 10; and, 4) coordinates of each hole and hazard, with respect to the reference coordinate system 24." |

Page 17

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| locator means for automatically determining the current location of the portable computer on the golf course; and | Fig. 1 (106); Fig. 2; Fig. 5 | Fig. 1 (12) |
|---|---|---|
| | 6:24-33 - "The position interface electronics 106 receives externally generated positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below. Following initial processing of the signals 114, the interface electronics 106 then couples information gleaned from those signals to the processor 104."

11:15-59 - "As mentioned above, the positional information that the mobile unit processes to provide distance and other related information to a player can be derived from a variety of sources. By way of example, such sources can include the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters and receivers, electromechanical sensors operating in combination with a gyroscope, compass, and/or ground based acoustic transducers. ¶ The GPS comprises a 21 NAVSTAR satellite constellation orbiting at 20,180 kilometers above the earth. These satellites provide real-time navigation and positioning information to anyone on earth with a GPS receiver. The operation of the GPS is conceptually straight forward. Each GPS satellite transmits a microwave radio signal that details the satellite identification number, its internal atomic clock, and the orbital location of the satellite (which is acquired through radar tracking). The elapsed time between the signal transmission, which is calibrated to an on-board atomic clock (typically either rubidium or cesium frequency standards), and the receipt at the ground-based GPS receiver, which has its own internal clock and antenna, divided by the speed of light, is, roughly, the distance to one satellite. By computing the distance from each of three satellites, a triangulation is effected which enables the ground-based GPS receiver to determine its own position on the earth's surface. By computing the distance to each of four or more satellites, the ground-based receiver can determine its position in three dimensions, including height. ¶GPS receivers are available from a variety of manufacturers. By way of example, the GPS NAV 100 and the TRAXXAR 6 channel GPS are available from Motorola and Magellan, respectively. Typically, these receivers have location accuracies in the range of 25 meters. However, for greater accuracy, users can turn to differential GPS, commonly denoted as DGPS. DGPS is widely used. For example, the US. Coast Guard has | 2:51-67 - "A local coordinate system is then associated with the device in such a way that the local x-axis and y-axis coincide with the axes of the movement measuring device portion of the device. The movement measuring device includes an accelerometer for measuring linear movement. As the golfer moves along the fairway, the portable device continuously computes the coordinates of the golfer, with respect to the reference coordinate system, by integration of the linear acceleration values read from the linear accelerometer. Instantaneous displacements with respect to the local coordinate system are then converted to displacements with respect to the reference coordinate system to account for differences. At any time, therefore, the device can compute the distance of the golfer from any significant point on the golf course whose coordinates have been provided to the device and stored in its memory."

4:5-40 - "For each golf hole 22, the invention is provided with the cartesian coordinates, with respect to the reference coordinate system 24, of important points on the fairway, e.g. the flag pole/hole 32, and any notable hazard such as water 40, sand 42, or trees 44. ¶ A local coordinate system 46 is associated with the invention in such a way that the local X-axis 48 and local Y-axis 50 correspond with reference X-axis 39 and reference Y-axis 38. As the golfer moves on the fairway 30, the invention continuously computes the coordinates of the golfer with respect to the reference coordinate system 24 by integration of the linear acceleration values read from the two "on-board" linear accelerometers within the movement measurer 12. ¶ Instantaneous displacements with respect to the local coordinate system 46 are then converted to displacements with respect to the reference coordinate system 24 to account for the rotation |

Re-Examination of U.S. Patent No. 5,507,485                                  UPLAY-101RX

initiated several reference stations around US. Coastal waters to provide DGPS to U.S. harbors. Likewise, the Federal Aviation Administration has installed advanced DGPS equipment at some airports to replace the older radio beacons and to improve location accuracy to approximately one foot."

12:20-23 - "FIG. 5 depicts a system 400 according to the invention which includes a mobile interface unit 402, similar to the unit 102 of FIG. 1, that is adapted for operation with the GPS satellite constellation 404."

Claim 1 - "1. A portable distance tracking system for use by a golfer on a golf course ... wherein said system comprises at least one mobile interface unit including:

A. a memory element including means for storing digitized map representations of a plurality of golf courses;

B. position interface electronics including a first GPS receiver for receiving position indicative signals from a Global Positioning System satellite constellation located in orbit around the Earth, wherein said position indicative signals are representative of a geographical location of said mobile interface unit;

C. a data processor, coupled to said memory element and to said position interface electronics, and including means for processing said position indicative signals to determine said geographical location of said mobile interface unit, means for corresponding said geographical location of said mobile interface unit with said digitized map representations to automatically identify a particular golf course that a golfer has selected to play means for corresponding said geographical location of said mobile interface unit with said digitized map representation of said particular golf course to determine a field location of said mobile interface unit on said particular golf course, and means for determining a distance between said mobile interface unit and said first landmark ..."

Claim 33 - "33. A system for determining the distance between a first location and a second location on a particular hole on a golf course, comprising:

(A) GPS receiver means, positioned at said first location, for receiving a global earth position of said first location;

(B) a memory element having means for storing digitized map representations of a plurality of holes on a golf course; and

of the local X-axis 48 with respect to the reference X-axis 39. The rotation is continuously computed, as more fully discussed in FIG. 3, by the device by integrating the angular acceleration read from the on-board angular accelerometer. ¶ At any time, therefore, the invention can compute the distance of the golfer from any significant topographical feature on the golf hole 22 whose coordinates have been provided to the device and stored in its memory 16. Referring to FIG. 2, for example, reference point 1 short of water hazard 40, reference point 2 short of trees 44, reference point 5 short of trees 44, reference point 3 just beyond water hazard 40, reference point 4 just before sand trap 42, reference point 6 just beyond sand trap 42, and reference point 7 at the front edge of green 34, in addition to the current hole placement for flag 32, can all be stored in the device for use as distance references during play of the hole."

Re-Examination of U.S. Patent No. 5,507,485

UPLAY-101RX

| | | |
|---|---|---|
| | (C) processing means in communication with said GPS receiver means, comprising<br><br>i) means for correlating said global earth position with said digitized map representations to automatically identify said particular hole on said golf course, and<br>ii) means for correlating said first location to said second location to determine from said first location to said location. | |
| processor means, coupled to said locator means, display means and memory means, for causing said display means to display a selected one of said three views and data of the particular hole as determined by its current location on the golf course. | Fig. 1(104); Fig. 2<br><br>6:18-20 - "the unit 102 ... includes a ... processor 104"<br><br>7:13-15 - "In response, the processor 104 accesses the map for the selected course from the memory 112, and the display 200 shows the selected course code in the "COURSE:" field."<br><br>7:25-28 - "In response to that determination, the processor 104 can then access the digitilized map information stored in memory 112 for the particular golf course."<br><br>8:23-39 - "Alternatively, as a golfer approaches the tee for a particular hole, the unit 200 can receive a signal, via the interface 114, that automatically programs the hole to be played. Additionally, in response to receiving the hole designation, the processor 104 accesses map information stored in memory 112 and transmits this information to the display 200. The display 200 provides a graphical representation of the selected hole in field 202a. As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed. Additionally, the processor correlates the position information provided by the position interface electronics 106 with the map information provided by the memory 112 to determine the position of the mobile unit 200 on the golf course. The golfer's position is illustrated on the display 202a by the character at 1."<br><br>10:28-34 - "Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play. Also, the alphanumeric display 202b can be integrated with the graphical display 202a, to further conserve on display space."<br><br>Claim 19 - "A portable distance tracking system according to claim 8 wherein said system includes means for dynamically updating said displayed | Fig. 1 - processor means (14) coupled to locator means (12), display means (20) and memory means (16)<br><br>6:15-22 - "The golf course data bank is used to store the following information for each hole of the golf course: 1) hole outline, which is used for display on the portable device 10 and for determining fairway boundaries; 2) green outline, used for display on the portable device 10; 3) hazards outline, used for display on the portable device 10; and, 4) coordinates of each hole and hazard, with respect to the reference coordinate system 24."<br><br>7:52-8:5 - "Player then keys in the hole number, one, and gets a view of the entire hole on display device 20. Player then can determine the distance from tee 76 to any hazard identified on the screen. Once the distances have been accurately determined, the player can refer to portable device 10 for past performance and recommended club selection. A club is selected and that data is entered into the device and the portable device is then replaced on the golf bag or attached to the belt. After hitting the golf ball, player moves to the ball. At any point during his travel to his ball, he can utilize the system to determine distances to hazards since the updating of the local reference system to the reference coordinate system is continuous. Typically, however, the portable device 10 would be used next once the player had arrived to the position of his ball. At that point, portable device 10 is referenced and the display screen is chosen that is appropriate. If the player is still in the fairway, the view |

Page 20

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| | | |
|---|---|---|
| | portion of said particular hole in dependence on said field location of said mobile interface unit." | of the entire course is utilized to determine what hazard next lies ahead of the golfer and the distance thereto, or to the green, if that is appropriate." |

Claim 1- *Barber* in view of *Bianco*

Claim 1 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Bianco.

Claim Chart #1a above shows Barber teaches all elements of Claim 1, except Barber does not teach using any structure of a GPS system for the "locator means," and GPS in general is the only means disclosed in the '485 Patent corresponding to the "locator means" recited in Claim 1.

Claim Chart #1a above shows Bianco teaches GPS for the locator means.

It would have been obvious to combine use of GPS as taught in Bianco, with the golf device of Barber, because Bianco explicitly teaches the interchangeability of various position determination technologies. See, e.g., Bianco, col. 6, lines 24-31 ["The position interface electronics 106 receives externally generated positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below."]. One of ordinary skill would also be motivated to modify the device of Barber to use GPS as taught in Bianco because those of ordinary skill knew at the time of the invention that using GPS could have provided a more accurate determination of location, and as noted in Bianco, required less installation and/or modification of equipment on the golf course. See., e.g., Bianco col. 2, lines 25-29 ["Another disadvantage to some prior art golf location systems is that they require special tracking sensors to be installed. Such installation can be labor intensive and also disruptive to play. Additionally, maintenance of the tracking systems can be costly."]

Claim 1- *Barber* in view of *Huston*

Claim 1 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #1a above shows Barber teaches all elements of Claim 1, except Barber does not teach using any structure of a GPS system for the "locator means," and GPS in general is the only means disclosed in the '485 Patent corresponding to the "locator means" recited in Claim 1. Claim Chart #1b below shows Huston teaches GPS for the locator means.

It would have been obvious to combine use of GPS as taught in Huston, with the golf device of Barber, because using GPS could have provided a more accurate determination of location, and as noted in Bianco, required less installation and/or modification of equipment on the golf course. See., e.g., Bianco col. 2, lines 25-29 ["Another disadvantage to some prior art golf location systems is that they require special tracking sensors to be installed. Such installation can be labor intensive and also disruptive to play. Additionally, maintenance of the tracking systems can be costly."] Further, Bianco specifically discloses using GPS, and also explicitly teaches using various other technologies for receiving the position interface signals. See, e.g., Bianco, col. 6, lines 24-31 ["The position interface electronics 106 receives externally generated

Re-Examination of U.S. Patent No. 5,507,485                                         UPLAY-101RX

positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below."].

| Claim Chart #1b (Claim 1) | |
|---|---|
| USPN 5,507,485 | Huston 5,364,093 |
| A portable golf computer comprising: | Fig. 2; Fig. 10<br><br>4:16-32 - "...the system of the present invention includes a remote unit 10, base station 12, and cup locator 14. A remote unit 10 accompanies the golfer during the round--for example mounted on the golf cart. ¶As shown in FIG. 2, the remote unit 10 includes a packet radio system 20, a GPS antenna 21 and receiver 22, a CPU 24, storage 25, a display 26, and a control device 28. ... The antenna 21 is either remote or internal to the receiver 22, but in any event is mounted on the golf cart...."<br><br>6:33-34 - "Turning to FIG. 2 the remote unit is preferably mounted on a golf cart."<br><br>8:7-8 - "FIG. 9 [sic FIG. 10] illustrates an alternative embodiment remote unit 80 which is preferably mounted on a golf cart." |
| display means for displaying scenes representative of the geographic layout of a golf course; | Figs. 1, 2, 10<br><br>4:33-38 - "The display 26 is illustrated in FIGS. 1 and 2. The display 26 is preferably a 640.times.480 pixel LCD supertwist, ISA bus compatible display, but other conventional types of displays are operable. The display depicts the layout of the hole being played, as well as a distance box 30 and present position icon 33."<br><br>6:54-66 - "The player can also visually track the progress of the icon 33--representing the remote unit 10 as the golf cart progresses on the hole layout from tee 32 to green 101. ... The CPU calculates an approximate distance from the icon 33 to the mark "A" and displays the distance to the player in the space of box 30 labeled "CART TO A". ¶For example, FIG. 1 represents a 520 yard par 5 with water 102 on the left side and in front of an elevated green 101. Trees 103 in the rough 104 and the fairway 105, as well as a trap 107 in front of the green are factors." |
| memory means for storing [data] representative of said scenes for each hole on the golf course; | Fig. 2; Fig. 10<br><br>4:52-55 - "The storage 25 preferably includes nonvolatile memory which stores a database of the hole layouts (preferably bitmap), as well as the corrected location of the cup on each hole."<br><br>8:15-17 - "In particular, the storage 92 similarly contains a course geography database, but in addition contains the location of a calibration location for each hole." |
| said data stored in said memory means including data representative of three different views for each hole, including: (i) the entirety of said hole, (ii) the approach to a green associated with said hole, and (iii) the green including said hole; | Figs. 1, 2, 10<br><br>4:36-38 - "The display depicts the layout of the hole being played, as well as a distance box 30 and present position icon 33."<br><br>8:15-17 - "In particular, the storage 92 similarly contains a course geography database, but in addition contains the location of a calibration location for each hole." |
| locator means for automatically determining the current location of the | Figs. 2, 7C, 7D, 9, 10<br><br>4:18-24 - "A remote unit 10 accompanies the golfer during the round--for example |

Page 22

Re-Examination of U.S. Patent No. 5,507,485                                                    UPLAY-101RX

| | |
|---|---|
| portable computer on the golf course; and | mounted on the golf cart. ¶ As shown in FIG. 2, the remote unit 10 includes a packet radio system 20, a GPS antenna 21 and receiver 22, a CPU 24, storage 25, a display 26, and a control device 28." |
| | 6:39-45 - "The remote unit 10 preferably continuously operates to calculate the distance from the unit 10 to the cup on the hole being played. As shown in FIG. 7B the GPS receiver 22 determines an apparent position and then reads the current error correction stored in memory 25. The CPU 24 applies the current error correction to the apparent position to calculate a corrected position." |
| | 6:54-56 - "The player can also visually track the progress of the icon 33-- representing the remote unit 10 as the golf cart progresses on the hole layout from tee 32 to green 101." |
| | 8:10-13 - "The remote unit 80 includes a GPS receiver 82, GPS antenna 84, CPU 86, display 88, control device 90, storage 92 and calibration 94." |
| processor means, coupled to said locator means, display means and memory means, for causing said display means to display a selected one of said three views and data of the particular hole as determined by its current location on the golf course. | Figs. 1, 2, 10<br><br>6:39-53 - "The remote unit 10 preferably continuously operates to calculate the distance from the unit 10 to the cup on the hole being played. As shown in FIG. 7B the GPS receiver 22 determines an apparent position and then reads the current error correction stored in memory 25. The CPU 24 applies the current error correction to the apparent position to calculate a corrected position. The corrected position is compared to the corrected cup location retrieved from memory 25 and the difference is determined and shown as the distance on display 26. In FIG. 1, the far left space in box 30 shows the distance from the remote unit 10 to the cup. Preferably, the remote unit 10 is placed as close as possible to the ball so the distance readout in box 30 "CART TO PIN" is an accurate reflection of the distance of the ball to the pin."<br><br>Abstract - "Preferably, the receiver includes a display of the golf hole being played, with the location of the receiver on the hole, the golf cup on the green, and the distance to the golf cup being displayed." |

## 2.    CLAIM 2

### Claim 2- *Bianco* in view of *Barber*

Claim 2 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #2a below shows both Bianco and Barber teach an input means coupled to the processor as recited in Claim 2.

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Since Claim 2 depends directly from Claim 1, and both Bianco and Barber teach the additional limitations of Claim 2, Claim 2 is obvious over Bianco in view of Barber.

| Claim Chart #2a (Claim 2) | | |
|---|---|---|
| USPN 5,507,485 | Bianco 5,438,518 | Barber 5,245,537 |
| A portable golf computer as defined in claim 1, further | Fig. 1(108); Fig. 2(204)<br><br>6:19-22 - "...the unit 102 ... includes a processor 104, position interface electronics 106, a user input interface 108, a display 110, and memory 112." | Fig 1 (18); Fig. 4<br><br>3:51 - "A keypad 18 allows user input..." |

Re-Examination of U.S. Patent No. 5,507,485                    UPLAY-101RX

| comprising input means coupled to said processor means. | 6:51-54 – "The user interface 108, which by way of example can be a keyboard, enables golfers to query the processor 104 as to distance and performance related information."<br><br>6:66-67 – "The unit 200 includes a display 202 and keyboard interface 204." | 5:13-16 – "Keyboard 18 includes cursor director device 60 and other obvious data entry keys such as distance to the hole at any time 62, distance to hazard 64, etc." |

### Claim 2- *Barber* in view of *Huston*

Claim 2 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #2b below shows both Barber and Huston teach an input coupled to the processor as recited in Claim 2.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Since Claim 2 depends directly from Claim 1, and both Barber and Huston teach the additional limitations of Claim 2, Claim 2 is obvious over Barber in view of Huston.

| Claim Chart #2b (Claim 2) | | |
|---|---|---|
| USPN 5,507,485 | Barber 5,245,537 | Huston 5,364,093 |
| A portable golf computer as defined in claim 1, further comprising input means coupled to said processor means. | Fig 1 (18); Fig. 4<br><br>3:51 – "A keypad 18 allows user input..."<br><br>5:13-16 – "Keyboard 18 includes cursor director device 60 and other obvious data entry keys such as distance to the hole at any time 62, distance to hazard 64, etc." | Fig. 2 (28); Fig. 8<br><br>4:45-51 – "FIG. 8 illustrates one embodiment of the control device 28. The four direction keys 110 are used for marking locations on the hole (see FIG. 1, marks A and B). The twelve function keys 112 operate to function as labeled. While a pen based control system might be preferable functionally to the device 28 illustrated in FIG. 8, cost considerations prompted the choice of the device 28."<br><br>6:57 – 7:9 – "For shot planning, the player can mark a location (e.g. "A") on the display 26 using the pointing device 28. The CPU calculates an approximate distance from the icon 33 to the mark "A" and displays the distance to the player in the space of box 30 labeled "CART TO A." ... ¶ The player might mark the display 26 at position B with the pointing device 28. The far right space on box 30 labeled "B TO PIN" would read the approximate distance 175." |

### 3.      CLAIM 3

### Claim 3- *Bianco* in view of *Barber*

Claim 3 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #3a below shows both Bianco and Barber teach an input means comprising a "keyboard or keypad" as recited in Claim 3.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber.

Re-Examination of U.S. Patent No. 5,507,485                                         UPLAY-101RX

Since Claim 3 depends directly from Claim 2, and both Bianco and Barber teach the additional limitations of Claim 3, Claim 3 is obvious over Bianco in view of Barber.

| Claim Chart #3a (Claim 3) | | |
|---|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer as defined in claim 2, wherein said input means comprises a keyboard or keypad. | See Claim Chart #2a above | See Claim Chart #2a above |

<u>Claim 3- *Barber* in view of *Huston*</u>

Claim 3 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #3b below shows both Barber and Huston teach an input means comprising a "keyboard or keypad" as recited in Claim 3.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Since Claim 3 depends directly from Claim 2, and both Barber and Huston teach the additional limitations of Claim 3, Claim 3 is obvious over Barber in view of Huston.

| Claim Chart #3b (Claim 3) | | |
|---|---|---|
| **USPN 5,507,485** | **Barber 5,245,537** | **Huston 5,364,093** |
| A portable golf computer as defined in claim 2, wherein said input means comprises a keyboard or keypad. | See Claim Chart #2b above | See Claim Chart #2b above |

## 4.    CLAIM 4

<u>Claim 4- *Bianco* in view of *Barber*</u>

Claim 4 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #4a below shows Barber teaches an input means comprising a "cursor pointing device" as recited in Claim 4.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber. Since Claim 4 depends directly from Claim 2, and Barber teaches the additional limitations of Claim 4, Claim 4 is obvious over Bianco in view of Barber.

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| Claim Chart 4a (Claim 4) | |
| --- | --- |
| **USPN 5,507,485** | **Barber 5,245,537** |
| A portable golf computer as defined in claim 2, wherein said input means comprises a cursor pointing device. | See Claim Chart 2a above, specifically item (6) in Fig. 4 |

### Claim 4- *Barber* in view of *Huston*

Claim 4 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #4b below shows both Barber and Huston teach an input means comprising a "cursor pointing device" as recited in Claim 4.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Since Claim 4 depends directly from Claim 2, and both Barber and Huston teach the additional limitations of Claim 4, Claim 4 is obvious over Barber in view of Huston.

| Claim Chart #4b (Claim 4) | | |
| --- | --- | --- |
| **USPN 5,507,485** | **Barber 5,245,537** | **Huston 5,364,093** |
| A portable golf computer as defined in claim 2, wherein said input means comprises a cursor pointing device. | See Claim 2 above, specifically Fig. 4 (60) | See Claim 2 above |

### 5.    CLAIM 5

### Claim 5- *Bianco* in view of *Barber*

Claim 5 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #5 below shows both Bianco and Barber teach "means for inputting stroke data to said computer" as recited in Claim 5.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber. Since Claim 5 depends directly from Claim 2, and both Bianco and Barber teach the additional limitations of Claim 5, Claim 5 is obvious over Bianco in view of Barber.

| Claim Chart #5 (Claim 5) | | |
| --- | --- | --- |
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer as defined in claim 2, wherein said input means includes means for inputting stroke data to | Fig. 1(108), Fig. 2(204)<br><br>4:12-17 - "The keyboard also enables the golfer to enter for storage and/or display various information while playing a round of golf. For example, according to further embodiments of the invention, a golfer can enter the score on a particular hole, the number of penalty shots taken, and the number of putts taken." | 6:23-34 - "A player performance data base is also created and maintained on the golf club base system 70. This data base holds the following information at minimum, in the preferred embodiment, on each club member player: 1) player name; 2) player address; 3) membership ID; 4) |

Re-Examination of U.S. Patent No. 5,507,485                                     UPLAY-101RX

| said computer. | 9:66-10:2 - "The mobile unit 200 can also provide the golfer with a convenient system for keeping score. Following the completion of a hole, the golfer can actuate the "SCORE" command key followed by the score for that hole."<br><br>Claim 26 - "... said keyboard includes means for entering a hole score achieved by a golfer on said holes..."<br><br>Claim 29 - "... said memory includes means for storing information regarding at least one round of golf on said particular golf course, said keyboard includes means for signaling said processor to recall said information from said memory... wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, putts taken on particular holes, ..."<br><br>Claim 32 - "... said mobile interface unit memory includes means for storing information regarding at least one round of golf on said golf course, said keyboard includes means for signaling said processor to recall said information from said memory... wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, putts taken on particular holes, ..." | fairway's hit (driving accuracy); 5) greens in regulation; 6) up and down (sand saves, two strokes or less); 7) penalty strokes; 8) par breakers (percentage per year); 9) number of eagles; 10) number of birdies; 11) scoring average; 12) handicap (current); and 13) club selection parameters."<br><br>7:7-16 - Referring now to FIG. 9, the hole by hole report contains the following data: club name; player name; membership ID; date; hole number; hole par number; tee to hole distance; for each stroke, club used, distance hit; total putts; total score; and penalty strokes. As shown in FIG. 10, the round summary report contains the following data: club name; player name; membership ID; date; total and average putts; total fairways in regulation; total green in regulation; total score; handicap; and, net score."<br><br>8:12-14 - "The total number of strokes, including putts, utilized to finish the hole is entered and the player proceeds to the number two tee." |

### Claim 5- *Barber* in view of *Huston*

Claim 5 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #5 above shows Barber teaches "means for inputting stroke data to said computer" as recited in Claim 5.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Since Claim 5 depends directly from Claim 2, and Barber teaches the additional limitations of Claim 5, Claim 5 is obvious over Barber in view of Huston.

## 6.     CLAIM 6

### Claim 6- *Bianco* in view of *Barber* and further in view of *Bonito*

Claim 6 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Bonito.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber. Claim 6 depends directly from Claim 2, and recites the additional limitation of "means for inputting betting data to said computer."

Page 27

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

Claim Chart #6 below shows Bonito teaches "means for inputting betting data to said computer" as recited in Claim 6.

It would have been obvious to combine the means for inputting betting data as taught by Bonito, with the combination of Bianco and Barber, because both Bianco and Barber (as well as Bonito) disclose devices that keep score during play (see, e.g., Claim Chart #5 above), and betting is typically tied directly to scoring, so adding the ability to input betting data would allow golfers to track their bets and scores on the same device.  In fact, as seen in Claim Chart #6 below, Bonito often refers to scoring and betting together ("...keyboard for entering scores and players' bets"; "...each bet is computed on a score card..."), and even discloses the "separate bets" are controlled by the "score memory module."

| Claim Chart #6 (Claim 6) | |
|---|---|
| **USPN 5,507,485** | **Bonito 5,095,430** |
| A portable golf computer as defined in claim 2, wherein said input means includes means for inputting betting data to said computer. | Abstract - "The computer has a keyboard for entering scores and players' bets and other information."<br><br>6:61 - 7:2 - "The subordinate program modules include: a score memory control module 72 that stores each players' scores as they are entered during the game; it may also have provision for storing separate bets between players as may be desired. The actual storing of the numbers takes place in the RAM 41, under control of the score memory control module 72..."<br><br>7:41-46 - "The players are next to identify themselves to the golf cart computer in step 104, in which a start dialogue is presented on the screen which guides the players through the dialogue in which they enter their names, handicaps, side bets and so on, according to established rules."<br><br>8:24-28 - "After computing and printing the score, each player tears off his score card from the score card printer 66 in step 117. If there are side bets, each bet is computed on the score card which is torn off in step 118 and the transaction is completed in step 119." |

Claim 6- *Barber* in view of *Huston* and further in view of *Bonito*

Claim 6 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Bonito.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Claim 6 depends directly from Claim 2, and recites the additional limitation of "means for inputting betting data to said computer."

Claim Chart #6 above shows Bonito teaches "means for inputting betting data to said computer" as recited in Claim 6.

It would have been obvious to combine the means for inputting betting data as taught by Bonito, with the combination of Barber and Huston, because Barber and Bonito both disclose devices that keep score during play (see, e.g., Claim Chart #5 above), and betting is typically tied directly to scoring, so adding the ability to input betting data would allow golfers to track their bets and scores on the same device.  In fact, as seen in Claim Chart #6 below, Bonito often refers to scoring and betting together ("...keyboard for entering scores and players' bets"; "...each bet is

Page 28

computed on a score card..."), and even discloses the "separate bets" are controlled by the "score memory module."

## 7.    CLAIM 7

### Claim 7- *Bianco* in view of *Barber* and further in view of *Jones*

Claim 7 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Jones.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber. Claim 7 depends directly from Claim 2, and recites the additional limitation of "means for inputting wind speed or direction to said computer."

Claim Chart #7 below shows Jones teaches "means for inputting wind speed or direction to said computer" as recited in Claim 7.

It would have been obvious to combine the means for inputting wind speed or direction data as taught by Jones, with the combination of Bianco and Barber, because both Bianco and Barber (as well as Jones) disclose devices that determine the distance from the ball to the tee (or other landmarks) to help the golfer decide on the proper club for the distance, and allowing the golfer to account for wind speed or direction would allow the golfer to make a more informed decision. See, e.g., Barber col. 2, lines 51-67 ["...the portable device continuously computes the coordinates... At any time therefore, the device can compute the distance of the golfer from any significant point on the golf course..."].  See, e.g., Bianco, col. 2, lines 41-43 ["A further object of the invention is to provide golfers with accurate distance information on a golf course..."].  In fact, as seen in Claim Chart #7 below, Jones specifically discloses using wind data to adjust for distance and direction before recommending the proper club.

| Claim Chart #7 (Claim 7) | |
|---|---|
| **USPN 5,507,485** | **Jones 4,136,394** |
| A portable golf computer as defined in claim 2, wherein said input means includes means for inputting wind speed or direction to said computer. | Abstract - "The remote unit also receives input wind conditions and determines range and direction corrections to the actual distance based upon these wind conditions. From the wind corrected distance, the remote unit automatically selects the proper club for the next shot." |
| | 2:41-43 - "The golf distance indicator system includes the capability to input wind direction and wind strength conditions in the remote unit..." |

### Claim 7- *Barber* in view of *Huston* and further in view of *Jones*

Claim 7 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Jones.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Claim 7 depends directly from Claim 2, and recites the additional limitation of "means for inputting wind speed or direction to said computer."

Re-Examination of U.S. Patent No. 5,507,485                    UPLAY-101RX

Claim Chart #7 above shows Jones teaches "means for inputting wind speed or direction to said computer" as recited in Claim 7.

It would have been obvious to combine the means for inputting wind speed or direction data as taught by Jones, with the combination of Barber and Huston, because both Barber and Huston (as well as Jones) disclose devices that determine the distance from the ball to the tee (or other landmarks) to help the golfer decide on the proper club for the distance, and allowing the golfer to account for wind speed or direction would allow the golfer to make a more informed decision. See, e.g., Barber col. 2, lines 51-67 ["...the portable device continuously computes the coordinates... At any time therefore, the device can compute the distance of the golfer from any significant point on the golf course..."]. See, e.g., Huston, col. 1, lines 63-65 ["For example, it is important to know the distance the ball needs to travel to carry a trap or water hazard in front of the green."] In fact, as seen in Claim Chart #7 above, Jones specifically discloses using wind data to adjust for distance and direction before recommending the proper club.

## 8.    CLAIM 8

### Claim 8- *Bianco* in view of *Barber* and further in view of *Jenkins*

Claim 8 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Jenkins.

As shown above regarding Claim 2, the combination of Bianco and Barber discloses all the limitations of Claim 2, and it would have been obvious to combine Bianco with Barber. Claim 8 depends directly from Claim 2, and recites the additional limitation of "means for inputting ambient temperature to said computer."

Claim Chart #8 below shows Jenkins teaches "means for inputting ambient temperature to said computer" as recited in Claim 8.

It would have been obvious to combine the means for inputting ambient temperature into the computer as taught by Jenkins, with the combination of Bianco and Barber, because both Bianco and Barber (as well as Jenkins) disclose devices that determine the distance from the ball to the tee (or other landmarks) to help the golfer decide on the proper club for the distance, and allowing the golfer to account for ambient temperature would allow the golfer to make a more informed decision. Further, as seen above regarding Claim 7, Jones teaches inputting wind speed or direction to the computer and specifically discloses using wind data to adjust for distance and direction before recommending the proper club. Ambient temperature is simply another environmental weather factor, like wind speed or direction, that could be used to adjust a distance calculation and arrive at a more accurate determination as to which club to select for the distance.

| Claim Chart #8 (Claim 8) | |
|---|---|
| **USPN 5,507,485** | **Jenkins 5,294,110** |
| A portable golf computer as defined in claim 2, wherein said input means includes | 1:12-16 - "... it is necessary for the player to know the distance which the ball is to travel and the effects of existing conditions for which he or she must compensate to acquire the desired shot."<br><br>3:21-23 - "FIG. 8 shows a graph of typical trajectory of golf balls hit using the wood clubs |

Page 30

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| means for inputting ambient temperature to said computer. | shown, at standard temperature and pressure with no wind present." |
| --- | --- |
| | 3:24-26 - "FIG. 9 shows the typical trajectory of golf balls hit using the "irons" as indicated at standard temperature and pressure with no wind." |
| | 4:35-40 - "FIG. 4 shows a schematic of the electronic circuitry within the device 10. As noted before, the ambient conditions sensor 25, ... input data to the 32 bit Central Processing Unit." |
| | Claim 1 - "A portable golf shot analyzer and club selector, comprising: |
| | ... said first memory being preprogrammed with statistics concerning optimal distance travelled by a golf ball struck by various golf clubs as well as statistics concerning effects of (1) various ambient conditions, ..." |
| | Claim 2 - "The invention of claim 1, wherein said ambient conditions include temperature, barometric pressure and humidity." |

### Claim 8- *Barber* in view of *Huston* and further in view of *Jenkins*

Claim 8 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Jenkins.

As shown above regarding Claim 2, the combination of Barber and Huston discloses all the limitations of Claim 2, and it would have been obvious to combine Barber with Huston. Claim 8 depends directly from Claim 2, and recites the additional limitation of "means for inputting ambient temperature to said computer."

Claim Chart #8 above shows Jenkins teaches "means for inputting ambient temperature to said computer" as recited in Claim 8.

It would have been obvious to combine the means for inputting ambient temperature into the computer as taught by Jenkins, with the combination of Barber and Huston, because both Barber and Huston (as well as Jenkins) disclose devices that determine the distance from the ball to the tee (or other landmarks) to help the golfer decide on the proper club for the distance, and allowing the golfer to account for ambient temperature would allow the golfer to make a more informed decision. Further, as seen above regarding Claim 7, Jones teaches inputting wind speed or direction to the computer and specifically discloses using wind data to adjust for distance and direction before recommending the proper club. Ambient temperature is simply another environmental weather factor, like wind speed or direction, that could be used to adjust a distance calculation and arrive at a more accurate determination as to which club to select for the distance.

## 9.    CLAIM 9

### Claim 9- *Bianco* in view of *Barber*

Claim 9 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #9a below shows both Bianco and Barber teach using an LCD for the display as recited in Claim 9 (Barber refers to the display being like that of a laptop, which was well-known to use LCDs).

Page 31

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Since Claim 9 depends directly from Claim 1, and both Bianco and Barber teach the additional limitations of Claim 9, Claim 9 is obvious over Bianco in view of Barber.

| Claim Chart #9a (Claim 9) | | |
|---|---|---|
| USPN 5,507,485 | Bianco 5,438,518 | Barber 5,245,537 |
| A portable golf computer as defined in claim 1, wherein said display means comprises a flat-panel LCD display. | 4:49-50 - "Preferably, the invention thus includes indication element, e.g., an LED or LCD display, for indicating the distance to a user of said system." 11:10-12 - "According to the depicted embodiment, the display 302 is an LED or LCD display, such as those well known in the art." | 5:10-13 - "In this embodiment, keypad is rotatably attached to display device 20 so that display device 20 can be folded up as is known in the art for lap top computers, checkbooks, calculators, etc." |

### Claim 9- *Barber* in view of *Huston*

Claim 9 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #9b below shows both Barber and Huston teach using an LCD for the display as recited in Claim 9 (Barber refers to the display being like that of a laptop, which was well-known to use LCDs).

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Since Claim 9 depends directly from Claim 1, and both Barber and Huston teach the additional limitations of Claim 9, Claim 9 is obvious over Barber in view of Huston.

| Claim Chart #9b (Claim 9) | | |
|---|---|---|
| USPN 5,507,485 | Barber 5,245,537 | Huston 5,364,093 |
| A portable golf computer as defined in claim 1, wherein said display means comprises a flat-panel LCD display. | 5:10-13 - "In this embodiment, keypad is rotatably attached to display device 20 so that display device 20 can be folded up as is known in the art for lap top computers, checkbooks, calculators, etc." | 4:33-36 - "The display 26 is preferably a 640.times.480 pixel LCD supertwist, ISA bus compatible display, but other conventional types of displays are operable." |

## 10.    CLAIM 10

### Claim 10- *Bianco* in view of *Barber*

Claim 10 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #10 below shows both Bianco and Barber teach "displaying data indicative of the number of shots taken by a golfer" as recited in Claim 10.

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber.

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

Since Claim 10 depends directly from Claim 1, and both Bianco and Barber teach the additional limitations of Claim 10, Claim 10 is obvious over Bianco in view of Barber.

| Claim Chart #10 (Claim 10) | | |
|---|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer as defined in claim 1, wherein said display means includes means for displaying data indicative of the number of shots taken by a golfer. | Fig. 1(108); Fig. 2(204)

4:13-17 - "The keyboard also enables the golfer to enter for storage and/or display various information while playing a round of golf. For example, according to further embodiments of the invention, a golfer can enter the score on a particular hole, the number of penalty shots taken, and the number of putts taken."

10:2-7 - "The processor 104 updates the golfer's score and transmits the updated score to the display 202a. The display 202a in turn displays the score for the hole just played in the "SCORE:" field and also displays the updated total score in either the "BACK NINE:" or "FRONT NINE:" fields, as appropriate."

Claim 26 - "... said display includes means for displaying at least one of said hole scores at any particular time..."

Claim 29 - "... said display includes mean for displaying said information, wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, putts taken on particular holes, and distances hit with particular golf clubs."

Claim 32 - "... said display includes means for displaying said information, wherein said information includes at least one of total score, score on particular holes, clubs selected for particular shots, penalties taken on particular holes, putts taken on particular holes..." | Fig. 6

Claim 2 - "...c) the display means is also for displaying player performance data."

3:52-56 - "... a display device 20 is provided for presentation to the user of current position and distance measurements, including distance traveled from tee, distance to the green, distance to other hazards, etc., club selection, past performance, and other data." |

### Claim 10- *Barber* in view of *Huston*

Claim 10 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #10 above shows Barber teaches "means for displaying data indicative of the number of shots taken by a golfer" as recited in Claim 10.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Since Claim 10 depends directly from Claim 1, and Barber teaches the additional limitations of Claim 10, Claim 10 is obvious over Barber in view of Huston.

## 11.    CLAIM 11

### Claim 11- *Bianco* in view of *Barber* and further in view of *Bonito*

Claim 11 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Bonito.

As shown above regarding Claim 6, the combination of Bianco, Barber and Bonito discloses all the limitations of Claim 6, and it would have been obvious to combine Bianco with Barber and Bonito. Claim 11 depends directly from Claim 6, and recites the additional limitation of "displaying updated betting totals."

Claim Chart #6 above shows Bonito teaches displaying updated betting totals as recited in Claim 11. If the disclosure is not express, it is certainly inherent because the betting data would be displayed as it was being entered.

Since Claim 11 depends directly from Claim 6, and Bonito teaches the additional limitations of Claim 11, Claim 11 is obvious over Bianco in view of Barber and further in view of Bonito.

### Claim 11- *Barber* in view of *Huston* and further in view of *Bonito*

Claim 11 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Bonito.

As shown above regarding Claim 6, the combination of Barber, Huston, and Bonito discloses all the limitations of Claim 6, and it would have been obvious to combine Barber with Huston and Bonito. Claim 11 depends directly from Claim 6, and recites the additional limitation of "displaying updated betting totals."

Claim Chart #6 above shows Bonito teaches displaying updated betting totals as recited in Claim 11. If the disclosure is not express, it is certainly inherent because the betting data would be displayed as it was being entered.

Since Claim 11 depends directly from Claim 6, and Bonito teaches the additional limitations of Claim 11, Claim 11 is obvious over Barber in view of Huston and further in view of Bonito.

## 12.   CLAIM 12

### Claim 12- *Bianco* in view of *Barber* and further in view of *Germain*

Claim 12 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Germain.

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Claim 12 depends directly from Claim 1, and recites the additional limitation of the "means for displaying commercial messages."

Claim Chart #12 below shows Germain teaches "means for displaying commercial messages" as recited in Claim 12.

It would have been obvious to combine the displaying of commercial messages as taught by Germain, with the combination of Bianco and Barber, because doing so would allow the golf courses to promote their own services, and also would allow third parties to sponsor the devices and thus offset the cost for the golfers. In fact, Germain discloses including advertisements on the same page as the other relevant golf information (Germain col. 2, lines 54-65). Further,

Re-Examination of U.S. Patent No. 5,507,485                                                    UPLAY-101RX

Bianco cites Germain in the "References Cited" on the front page of Bianco, and Germain cites Barber in the "References Cited" on the front page of Germain.

| Claim Chart #12 (Claim 12) ||
|---|---|
| **USPN 5,507,485** | **Germain 5,319,548** |
| A portable golf computer as defined in claim 1, wherein said display means includes means for displaying commercial messages. | Fig. 1 (memory (12) connected to display (16) via CPU (10))<br>Fig. 2 (memory 12 stores ad information (40))<br><br>2:54-65 - "A single pocket-sized golf play recording card is provided for each hole. Each of the golf play recording cards may have the following information printed thereon: a layout of the fairway and green with distance indicating marks which indicate distance from a pin to various points on the course and distance from each of the tees to the various hazards on the course, cup location, topographical information showing the terrain of the hole, weather conditions, hazards, areas under repair, fairway conditions, putting green conditions, instructions on how to best play the hole, advertisements, and rules of play for the day."<br><br>5:52-55 - "Promotional advertising data storage area 40 stores information concerning advertising printed on the golf play recording cards and other material printed by the system."<br><br>6:10-13 - "CPU 10 is further connected to a display 16 which provides a golfer with ... the information being input and output to the system."<br><br>7: 62 - 8:1 - "The information that can be displayed on each card 70 for each hole includes but is not limited to: the name of the golf course 71, ... services available on that hole 76..."<br><br>14:23-26 - "...a hand held data recording device can be used in place of the golf play recording cards. A hand held recording device can include a display..." |

### Claim 12- *Barber* in view of *Huston* and further in view of *Germain*

Claim 12 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Germain.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Claim 12 depends directly from Claim 1, and recites the additional limitation of the "means for displaying commercial messages."

Claim Chart #12 above shows Germain teaches "means for displaying commercial messages" as recited in Claim 12.

It would have been obvious to combine the displaying of commercial messages as taught by Germain, with the combination of Barber and Huston, because doing so would allow the golf courses to promote their own services, and also would allow third parties to sponsor the devices and thus offset the cost for the golfers.  In fact, Germain discloses including advertisements on the same page as the other relevant golf information (Germain col. 2, lines 54-65).

### 13.    CLAIM 13

### Claim 13- *Bianco* in view of *Barber*

Claim 13 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Claim 13 depends directly from Claim 1, and recites the additional limitation of the "means for displaying a video image."

Claim Chart #13a below shows Bianco suggests a means for displaying a video image as recited in Claim 13. Since Claim 13 depends directly from Claim 1, and Bianco suggests the additional limitations of Claim 13, Claim 13 is obvious over Bianco in view of Barber.

| Claim Chart #13a (Claim 13) | |
|---|---|
| USPN 5,507,485 | Bianco 5,438,518 |
| A portable golf computer as defined in claim 1, wherein said display means includes means for displaying a video image. | 10:64-66 - "However, according to other embodiments, a small graphical display portion, such as those employed on hand held video games can be incorporated." |

Claim 13- *Bianco* in view of *Barber* and further in view of *Bonito*

Claim 13 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber and further in view of Bonito.

As shown above regarding Claim 13, Claim 13 is obvious over Bianco in view of Barber. However, if it is determined Bianco does not expressly or inherently teach the display means includes means for displaying a video image, Claim Chart #13b below shows Bonito expressly teaches this limitation, as Video RAM (with display interface) is the only means for displaying video disclosed in the '485 Patent. See '485 Patent, Fig. 5 (46) VIDEO RAM and Fig. 5 (45) VIDEO RAM INTERFACE.

It would have been obvious to the means for displaying video in Bonito, with Bianco and Barber, because all three teach portable golf devices displaying images of the golf course, and having means for displaying a video image would assist the golfer by allowing additional views of the relevant areas. Further, as seen above in Claim Chart #13a, Bianco suggests using such video means. Therefore, Claim 13 is obvious over Bianco in view of Barber, and further in view of Bonito.

| Claim Chart #13b (Claim 13) | |
|---|---|
| USPN 5,507,485 | Bonito 5,095,430 |
| A portable golf computer as defined in claim 1, wherein said display means includes means for displaying a video image. | Fig. 4 (40); Fig. 4 (36)<br><br>6:15-16 - "The VIDEO RAM memory 40 is connected to the computer bus 32 via a display interface (DISPL IF) 36." |

Claim 13- *Barber* in view of *Huston* and further in view of *Bonito*

Claim 13 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston and further in view of Bonito.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston.

Claim 13 depends directly from Claim 1, and recites the additional limitation of the "means for displaying a video image."

Claim Chart #13b above shows Bonito expressly teaches this limitation, as Video RAM (with display interface) is the only means for displaying video disclosed in the '485 Patent. See '485 Patent, Fig. 5 (46) VIDEO RAM and Fig. 5 (45) VIDEO RAM INTERFACE.

It would have been obvious to the means for displaying video in Bonito, with Barber and Huston, because all three teach portable golf devices displaying images of the golf course, and having means for displaying a video image would assist the golfer by allowing additional views of the relevant areas. Further, as seen above in Claim Chart #13a, Bianco suggests using such video means. Therefore, Claim 13 is obvious over Barber in view of Huston, and further in view of Bonito.

## 14.    CLAIM 14

Claim 14- *Bianco* in view of *Barber* and further in view of *Huston*

Claim 14 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Huston.

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Further as shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Since it would have been obvious to combine Bianco with Barber, and Barber with Huston, it would have been obvious to combine Bianco with Barber and Huston. Further, Bianco even cites both Barber and Huston in the "References Cited" on the front page of Bianco.

Claim 14 depends directly from Claim 1, and recites the additional limitation of "means for displaying the calculated position of a golf ball."

Claim Chart #14 below shows Huston teaches displaying the calculated position of a golf ball as recited in Claim 14. Since Claim 14 depends directly from Claim 1, and it would have been obvious to combine Bianco, Barber, and Huston, and Huston teaches the additional limitations of Claim 14, Claim 14 is obvious over Bianco in view of Barber and further in view of Huston.

| Claim Chart #14 (Claim 14) | |
|---|---|
| **USPN 5,507,485** | **Huston 5,364,093** |
| A portable golf computer as defined in claim 1, wherein said display means includes means for displaying | Fig. 1; Fig. 2<br><br>Abstract - "The position of the receiver is error corrected, with the error correction preferably calculated using a reference global positioning satellite receiver positioned at a known location."<br><br>6:39-48 - "The remote unit 10 preferably continuously operates to calculate the distance from the unit 10 to the cup on the hole being played. As shown in FIG. 7B the GPS receiver 22 determines an apparent position and then reads the current error correction stored in memory 25. The CPU 24 applies the current error correction to the apparent position to calculate a corrected position. The corrected position is compared to the corrected cup location retrieved from memory 25 and the |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| | |
|---|---|
| the calculated position of a golf ball. | difference is determined and shown as the distance on display 26." |

### Claim 14- *Barber* in view of *Huston*

Claim 14 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston.

Claim 14 depends directly from Claim 1, and recites the additional limitation of "displaying the calculated position of a golf ball."

Claim Chart #14 above shows Huston teaches displaying the calculated position of a golf ball as recited in Claim 14. Since Claim 14 depends directly from Claim 1, and Huston teaches the additional limitations of Claim 14, Claim 14 is obvious over Barber in view of Huston.

## 15.    CLAIM 15

### Claim 15- *Bianco* in view of *Barber*

Claim 15 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #15 below shows both Bianco and Barber teach a removable and writable memory card as recited in Claim 15.

As shown above regarding Claim 1, the combination of Bianco and Barber discloses all the limitations of Claim 1, and it would have been obvious to combine Bianco with Barber. Since Claim 15 depends directly from Claim 1, and both Bianco and Barber teach the additional limitations of Claim 15, Claim 15 is obvious over Bianco in view of Barber.

| Claim Chart #15 (Claim 15) | | |
|---|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer as defined in claim 1, further comprising a removable and writable memory card, coupled to said processor means, wherein said portable golf computer writes data to said memory card during or after a game of golf. | Fig. 2 (210)<br><br>7:3-5 - "The unit 200 also includes ... a removable memory module 210."<br><br>9:56-58 - "To down load information regarding a round of golf, the golfer simply provides the course operator with his removable memory module 210..." | 5:52-57 - "Further, the golf club base system 70 provides the input/output capabilities needed to transfer data between the base system 70 to the portable device 10 through serial link 66 as well as between the base system 70 and a personal laser card device 72."<br><br>6:11-13 - "The laser card drive is capable of reading and/or updating player's data recorded upon the personal laser card."<br><br>6:46-49 - "Further, the player performance information can also be recorded on the personal laser card device card (not shown) so that this information can be used at other clubs using the club base system 70."<br><br>Claim 4 - "The apparatus of claim 3 further comprising a transportable data card means for facilitating the transfer of player performance data." |

Claim 15- *Barber* in view of *Huston*

Claim 15 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #15 below shows Barber teaches a removable and writable memory card as recited in Claim 15.

As shown above regarding Claim 1, the combination of Barber and Huston discloses all the limitations of Claim 1, and it would have been obvious to combine Barber with Huston. Since Claim 15 depends directly from Claim 1, and Barber teaches the additional limitations of Claim 15, Claim 15 is obvious over Barber in view of Huston.

**16.    CLAIM 16**

Claim 16- *Bianco* in view of *Barber* and further in view of *Bonito*

Claim 16 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber, and further in view of Bonito.

As shown above regarding Claim 15, the combination of Bianco and Barber discloses all the limitations of Claim 15, and it would have been obvious to combine Bianco with Barber. Claim 16 depends directly from Claim 15, and recites the additional limitation of the memory card storing scoring and betting data.

Claim Chart #16 below shows Bianco discloses storing scoring data as recited in Claim 16. Claim Chart #6 above shows Bonito teaches storing scoring and betting data as recited in Claim 16. As shown above with regard to Claim 6, it would have been obvious to combine Bonito with the combination of Bianco and Barber. Further, Bonito expressly discloses using a removable memory card to store scoring data as recited in Claim 16. See., e.g., Bonito col. 4, lines 3-6 ["The golf cart computer 12 includes a receiving slot 15 for a removable memory cartridge 13 (FIG. 2) which serves to store electronic data relating to scores played by one or several players in a round of golf."].

Since Claim 16 depends directly from Claim 15, and Bianco discloses storing scoring data (with Bonito disclosing storing betting data), and both Bianco and Bonito teach using a removable memory card, Claim 16 is obvious over Bianco in view of Barber and further in view of Bonito.

| Claim Chart #16 (Claim 16) | |
|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** |
| A portable golf computer as defined in claim 15, wherein said removable memory card stores scoring and betting data. | 9:67-10:10 - "Following the completion of a hole, the golfer can actuate the "SCORE" command key followed by the score for that hole. The processor 104 updates the golfer's score ... This will signal the processor to update the score for the hole accordingly." |

Claim 16- *Barber* in view of *Huston* and further in view of *Bonito*

Claim 16 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston, and further in view of Bonito.

As shown above regarding Claim 15, the combination of Barber and Huston discloses all the limitations of Claim 15, and it would have been obvious to combine Barber with Huston. Claim 16 depends directly from Claim 15, and recites the additional limitation of the memory card storing scoring and betting data.

Claim Chart #6 above shows Bonito teaches storing scoring and betting data as recited in Claim 16. As shown above with regard to Claim 6, it would have been obvious to combine Bonito with the combination of Barber and Huston. Further, Bonito expressly discloses using a removable memory card to store scoring data as recited in Claim 16. See., e.g., Bonito col. 4, lines 3-6 ["The golf cart computer 12 includes a receiving slot 15 for a removable memory cartridge 13 (FIG. 2) which serves to store electronic data relating to scores played by one or several players in a round of golf."].

Since Claim 16 depends directly from Claim 15, and Bonito discloses storing scoring and betting data, and both Barber and Bonito teach using a removable memory card, Claim 16 is obvious over Barber in view of Huston and further in view of Bonito.

**17.    CLAIM 17**

Claim 17- *Bianco* in view of *Barber*

Claim 17 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

As shown above regarding Claim 15, the combination of Bianco and Barber discloses all the limitations of Claim 15, and it would have been obvious to combine Bianco with Barber. Claim 17 depends directly from Claim 15, and recites the additional limitation of storing data from a plurality of individual games.

Claim Chart #17 below shows both Bianco and Barber teach storing scoring data from a plurality of individual games as recited in Claim 17.

Since Claim 17 depends directly from Claim 15, and both Bianco and Barber teach the additional limitations of Claim 17, Claim 17 is obvious over Bianco in view of Barber.

| Claim Chart #17 (Claim 17) | | |
|---|---|---|
| USPN 5,507,485 | Bianco 5,438,518 | Barber 5,245,537 |
| A portable golf computer as defined in claim 15, wherein said removable memory card stores scoring data from a plurality of individual games. | 9:67-10:10 - "Following the completion of a hole, the golfer can actuate the "SCORE" command key followed by the score for that hole. The processor 104 updates the golfer's score ... This will signal the processor to update the score for the hole accordingly."<br><br>7:43-44 - "The mobile unit 200 can accommodate a plurality of golfers (typically four in one preferred embodiment)." | Abstract - "The individual player selects a portable distance tracking device and receives downloaded, updated, current topographical data from the base data base of the course he is to play, including his own personal past performance record"<br><br>6:35-39 - "During the operation of the device, the data base information relative to a player's performance is updated each time the performance data collected by the portable device 10 is uploaded to the base system 70 at the end of a round of play."<br><br>6:46-49 - "Further, the player performance information can also be recorded on the personal laser card device |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

| 8:46-49 - "Just prior to playing the hole, the golfers select which golfer is about to play. That golfer's code, e.g., 1, 2, 3, 4, etc. appears in the "PLAYER:" field." | card (not shown) so that this information can be used at other clubs using the club base system 70." 6:68 - 7:2 - "Commercially available personal cards have a storage capacity of two million characters, equivalent to an eight hundred page book." |
|---|---|

### Claim 17- *Barber* in view of *Huston*

Claim 17 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

As shown above regarding Claim 15, the combination of Barber and Huston discloses all the limitations of Claim 15, and it would have been obvious to combine Barber with Huston. Claim 17 depends directly from Claim 15, and recites the additional limitation of storing data from a plurality of individual games.

Claim Chart #17 above shows Barber teaches storing scoring data from a plurality of individual games as recited in Claim 17.

Since Claim 17 depends directly from Claim 15, and Barber teaches the additional limitations of Claim 17, Claim 17 is obvious over Barber in view of Huston.

## 18.    CLAIM 18

### Claim 18- *Bianco* (§ 103)

Claim 18 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco.

Claim Chart #18a below (which refers back to Claim Chart #1a above) shows Bianco teaches all elements of Claim 18 except Bianco does not expressly teach storing "data representative of a plurality of said scenes for each hole on the golf course." Bianco does, however, teach storing data representative of each hole. See, e.g., Bianco, col. 8, lines 30-34 ["As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed."]. Further, Bianco teaches that a display can be updated automatically to provide a more detailed view. See, e.g., Bianco col. 10, lines 28-31 ["Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play."].

It would have been obvious to modify Bianco's general teachings from providing updated more detailed views, to specifically storing data representative of a plurality of scenes for each hole, because doing so would have been an obvious design choice.

| Claim Chart #18a (Claim 18) | |
|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** |
| A portable golf computer comprising: | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above |

Re-Examination of U.S. Patent No. 5,507,485

UPLAY-101RX

| | |
|---|---|
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above |
| position sensing means for automatically sensing the location of the portable golf computer on said golf course; and | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to automatically display a particular one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at said hole. | See Claim Chart #1a above |

### Claim 18- *Bianco* in view of *Barber*

Claim 18 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #18b below (which refers back to Claim Chart #1a above) shows Bianco teaches all elements of Claim 18 except Bianco does not expressly teach storing "data representative of a plurality of said scenes for each hole on the golf course."

Claim Chart #18b below (which refers back to Claim Chart #1a above) shows that Barber does teach storing data representative of a plurality of scenes for each hole on the golf course. Specifically, see e.g., Claim Chart #1a and the discussion of Barber regarding Claim 1, including Barber col. 6, lines 15-22 ["The golf course data bank is used to store the following information for each hole of the golf course: 1) hole outline, which is used for display on the portable device 10 and for determining fairway boundaries; 2) green outline, used for display on the portable device 10; 3) hazards outline, used for display on the portable device 10; and, 4) coordinates of each hole and hazard, with respect to the reference coordinate system 24."].

It would have been obvious to combine storing data representative of a plurality of scenes for each hole on the golf course, as taught by Barber, with the golf device of Bianco, because as explained above, Bianco teaches changing the views to be more specific depending on the position of the golfer on a particular hole.

| Claim Chart #18b (Claim 18) | | |
|---|---|---|
| **USPN 5,507,485** | **Bianco 5,438,518** | **Barber 5,245,537** |
| A portable golf computer comprising: | See Claim Chart #1a above | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| position sensing means for automatically sensing the location of the portable golf computer on said golf course; and | See Claim Chart #1a above | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to automatically display a particular | See Claim Chart #1a above | See Claim Chart #1a above |

Page 42

Re-Examination of U.S. Patent No. 5,507,485                                       UPLAY-101RX

| one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at said hole. | | |
|---|---|---|

### Claim 18- *Barber* in view of *Huston*

Claim 18 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #18c below (which refers back to Claim Chart #1a above) shows Barber teaches all elements of Claim 18 except Barber does not teach using any structure of a GPS system for the "position sensing means," and GPS in general is the only means disclosed in the '485 Patent corresponding to the "position sensing means" recited in Claim 18.

Claim Chart #18c below (which refers back to Claim Chart #1a above) shows Huston teaches GPS for the position sensing means.

It would have been obvious to combine use of GPS as taught in Huston, with the golf device of Barber, because using GPS could have provided a more accurate determination of location, and as noted in Bianco, required less installation and/or modification of equipment on the golf course. See., e.g., Bianco col. 2, lines 25-29 ["Another disadvantage to some prior art golf location systems is that they require special tracking sensors to be installed. Such installation can be labor intensive and also disruptive to play. Additionally, maintenance of the tracking systems can be costly."]  Further, Bianco specifically discloses using GPS, and also explicitly teaches using various other technologies for receiving the position interface signals.  See, e.g., Bianco, col. 6, lines 24-31 ["The position interface electronics 106 receives externally generated positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below."].

| Claim Chart #18c (Claim 18) | | |
|---|---|---|
| **USPN 5,507,485** | **Barber 5,245,537** | **Huston 5,364,093** |
| A portable golf computer comprising: | See Claim Chart #1a above | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| position sensing means for automatically sensing the location of the portable golf computer on said golf course; and | See Claim Chart #1a above | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to automatically display a particular one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at said hole. | See Claim Chart #1a above | See Claim Chart #1a above |

Re-Examination of U.S. Patent No. 5,507,485                                    UPLAY-101RX

## 19.   CLAIM 19

### Claim 19- *Bianco* (§ 103)

Claim 19 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco.

Claim Chart #19a below (which refers back to Claim Chart #1a above) shows Bianco teaches all elements of Claim 19 except Bianco does not expressly teach storing "data representative of a plurality of said scenes for each hole on the golf course." Bianco does, however, teach storing data representative of each hole. See, e.g., Bianco, col. 8, lines 30-34 ["As can be seen from the illustrative hole shown in field 202a, all significant features of the hole being played, including the tee 2, the green 8 and various landmarks and hazards 3 through 7 can be displayed."]. Further, Bianco teaches that a display can be updated automatically to provide a more detailed view. See, e.g., Bianco col. 10, lines 28-31 ["Alternatively, as the golfer moves to different positions along a fairway, the display can be automatically updated to provide a more detailed display of the relevant area of play."].

It would have been obvious to modify Bianco's general teachings from providing updated more detailed views, to specifically storing data representative of a plurality of scenes for each hole, because doing so would have been an obvious design choice.

| Claim Chart #19a (Claim 19) | |
|---|---|
| USPN 5,507,485 | Bianco 5,438,518 |
| A portable golf computer comprising: | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above |
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above |
| position sensing means for sensing the location of the portable golf computer on said golf course; | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to display a particular one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at said hole; and | See Claim Chart #1a above |
| said position sensing means receives a signal from at least one earth orbiting satellite. | See Claim Chart #1a above |

### Claim 19- *Bianco* in view of *Barber*

Claim 19 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Bianco in view of Barber.

Claim Chart #19b below (which refers back to Claim Chart #1a above) shows Bianco teaches all elements of Claim 19 except Bianco does not expressly teach storing "data representative of a plurality of said scenes for each hole on the golf course."

Claim Chart #19b below (which refers back to Claim Chart #1a above) shows that Barber does teach storing data representative of a plurality of scenes for each hole on the golf course. Specifically, see e.g., Claim Chart #1a and the discussion of Barber regarding Claim 1, including Barber col. 6, lines 15-22 ["The golf course data bank is used to store the following information for each hole of the golf course: 1) hole outline, which is used for display on the portable device 10 and for determining fairway boundaries; 2) green outline, used for display on the portable device 10; 3) hazards outline, used for display on the portable device 10; and 4) coordinates of each hole and hazard, with respect to the reference coordinate system 24."].

It would have been obvious to combine storing data representative of a plurality of scenes for each hole on the golf course, as taught by Barber, with the golf device of Bianco, because as explained above, Bianco teaches changing the views to be more specific depending on the position of the golfer on a particular hole.

| Claim Chart #19b (Claim 19) | | |
|---|---|---|
| USPN 5,507,485 | Bianco 5,438,518 | Barber 5,245,537 |
| A portable golf computer comprising: | See Claim Chart #1a above | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| position sensing means for sensing the location of the portable golf computer on said golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to display a particular one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at said hole; and | See Claim Chart #1a above | See Claim Chart #1a above |
| said position sensing means receives a signal from at least one earth orbiting satellite. | See Claim Chart #1a above | See Claim Chart #1a above |

Claim 19- _Barber_ in view of _Huston_

Claim 19 of U.S. Patent No. 5,507,485 is unpatentable under 35 U.S.C. § 103 as being obvious over Barber in view of Huston.

Claim Chart #19c below (which refers back to Claim Chart #1a above) shows Barber teaches all elements of Claim 19 except Barber does not teach using any structure of a GPS system for the "position sensing means" (GPS in general is the only means disclosed in the '485 Patent corresponding to the "position sensing means" recited in Claim 19), and likewise, Barber does not teach a structure that "receives a signal from at least one earth orbiting satellite" as recited in Claim 19.

Re-Examination of U.S. Patent No. 5,507,485                                        UPLAY-101RX

      Claim Chart #19b below (which refers back to Claim Chart #1a above) shows that Huston does teach using GPS for the position sensing means, and likewise, Huston teaches a structure that "receives a signal from at least one earth orbiting satellite."

      It would have been obvious to combine use of GPS as taught in Huston, with the golf device of Barber, because using GPS could have provided a more accurate determination of location, and as noted in Bianco, required less installation and/or modification of equipment on the golf course.  See., e.g., Bianco col. 2, lines 25-29 ["Another disadvantage to some prior art golf location systems is that they require special tracking sensors to be installed. Such installation can be labor intensive and also disruptive to play. Additionally, maintenance of the tracking systems can be costly."]  Further, Bianco specifically discloses using GPS, and also explicitly teaches the interchangeability of various other technologies for determining position.  See, e.g., Bianco, col. 6, lines 24-31 ["The position interface electronics 106 receives externally generated positional information signals 114. The signals 114 can come from a variety of sources, such as, for example, the Global Positioning System (GPS) satellite constellation, ground based microwave transmitters, electromechanical sensors, or ground based acoustic transducers, all of which are discussed in further detail below."].

| Claim Chart #19c (Claim 19) | | |
|---|---|---|
| USPN 5,507,485 | Barber 5,245,537 | Huston 5,364,093 |
| A portable golf computer comprising: | See Claim Chart #1a above | See Claim Chart #1a above |
| display means for displaying scenes representative of the geographic layout of a golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| memory means for storing data representative of a plurality of said scenes for each hole on the golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| position sensing means for sensing the location of the portable golf computer on said golf course; | See Claim Chart #1a above | See Claim Chart #1a above |
| processor means, responsive to said position sensing means, for causing said display means to display a particular one of the scenes for a particular hole as determined by the sensed location of the portable golf computer at | See Claim Chart #1a above | See Claim Chart #1a above |